THOMAS G. McINTYRE et al. *v.* ALFRED INGRAHAM et al.

1. STATUTES, CONSTRUCTION OF.—In construing statutes, the inquiry is not as to the abstract force of the words used, but in what sense the Legislature intended to use them; and this sense is to be collected from the context; and a narrower or more extended meaning will be given according to the intention thus indicated. See *Mitchell* v. *Mitchell,* 5 Madd. 72; *Hotham* v. *Sutton,* 15 Ves. 320; *Stewart* v. *Earl of Bute,* 3 Ves. 212.

2. SAME: SAME: MEANING OF "PERSONAL ESTATE."—It is a question of much doubt whether the terms, "personal estate of any kind whatever," taken alone, embrace "promissory notes;" the result of the authorities in which the question has been involved, seems to be that they would not. See *Popham* v. *Lady Aylesbury,* Ambl. 68; *Moore* v. *Moore,* 1 Bro. C. C. 127; *Fleming* v. *Brooke,* 1 Sch. & Lef. 318; *Stewart* v. *Earl of Bute,* 3 Ves. 212; 2 Williams' Executors, 749 (1st edit.).

3. SAME: SAME: MEANING OF "EFFECTS," "ESTATE."—The terms, "effects," "estate," and words of like general import, when used in a clause containing an enumeration of personal estate, will generally be confined to *estate* or *effects, ejusdem generis* with those specified, if a different construction be not required

McIntyre et al. *v.* Ingraham et al.

by the context. See *Rawlings* v. *Jennings*, 13 Ves. 46; *Stewart* v. *Earl of Bute*, 3 Ves. 212; *Hotham* v. *Sutton*, 15 Ib. 320.

4. SAME.—It is a well-settled rule of construction, that words in different parts of a statute must be referred to their appropriate connection, giving to each in its place its proper force—*reddendo singula singulis*—and, if possible, rendering none of them useless and superfluous.

5. SAME: GRAND GULF BANK: RIGHT TO ASSIGN PROMISSORY NOTES.—The second section of the charter of the Grand Gulf Railroad and Banking Company, which, after prescribing upon what conditions the corporation shall go into operation, and fixing its name and term of existence, provides that the corporation shall have authority to "purchase and possess lands, tenements, and hereditaments, and *personal estate of any kind whatever*, . . . . . *and to sell and dispose of the same*," does not grant to the corporation the power to assign promissory notes; nor is such power anywhere granted by said charter.

6. CONSTRUCTION, POWERS OF.—A corporation, created by statute, possesses only those powers which the charter confers upon it, either expressly or as incidental to its very existence. See *Dartmouth College* v. *Woodward*, 4 Wheat. 636.

7. SAME: IMPLIED POWERS.—In order to derive a power in a corporation by implication, it must appear that the power thus sought to be implied is so necessary to the enjoyment of some specially granted right, that, without it, that right would fail.

8. SAME: SAME.—The power to assign promissory notes is not essential to the enjoyment of the franchise of banking, dealing in exchange and stocks, and constructing a railroad; and hence, cannot be implied from an express grant of such franchises to a corporation.

9. SAME: ACT OF 1840: GRAND GULF BANK.—The Act of 1840 (Hutch. Dig., 325, § 7), which prohibits the banks of this State from transferring promissory notes, &c., does not impair any right granted by its charter to the Grand Gulf Railroad and Banking Company; and hence, an assignment made by that Company of a promissory note, made after the passage of that Act, is null and void.

10. CONFLICT OF LAWS: COURTS OF EACH STATE MUST CONSTRUE ITS STATUTES.—The courts of each State are the proper tribunals to construe its statutes, and such construction will be adopted in all other jurisdictions in which they may come under consideration.

11. SAME: SUPREME COURT OF UNITED STATES JURISDICTION TO CONSTRUE STATE STATUTES: JUDICIARY ACT OF 1789, 25TH SECTION.—The right of the courts of the several States of this confederacy to construe the statutes of their respective States, is not impaired or abridged by the 25th section of the Judiciary Act of 1789, which gives the Supreme Court jurisdiction to decide the question of the validity of the statute of any State upon the ground of its being repugnant to the Constitution of the United States, except in case of the particular statute which the Supreme Court may declare unconstitutional; and hence, when a statute of a State is alleged to be unconstitutional, upon the ground that it impairs a contract or right created or secured by a former statute, the juris-

McIntyre et al. *v.* Ingraham et al.

diction of the Supreme Court does not extend to making an authoritative con-struction of such former statute which would be binding on the courts of that State ; but, in such a case, the State courts have the power to expound that statute, and declare what rights are secured by it; and the Supreme Court may decide whether the last statute violates or impairs the rights thus declared to be secured.

ERROR to the District Chancery Court at Natchez. Hon. B. C. Buckley, vice-chancellor.

In September, 1848, Ingraham and Read filed their bill against Thomas G. McIntyre and William Bridgers. This bill alleges, that by a deed of trust, executed by the Grand Gulf Bank to Ingraham and Lindsay, on the 10th of February, 1842, the Bank transferred and assigned to them and the survivor of them, &c., all its property and choses in action, in trust for the payment of its debts. That Lindsay died in 1842, and that, on the 31st of December, 1842, Ingraham and the Bank executed another deed of trust to Ingraham and George Read, conveying the same property and choses in action, upon the like trusts as in the first deed. That amongst the choses in action thus transferred, was a promissory note made by defendants, dated 18th Nov., 1841, and payable to said Bank.

That at April Term, 1846, of the Claiborne Circuit Court, judg-ment of forfeiture was rendered against the Grand Gulf Bank, which judgment was affirmed by the High Court at January Term, 1848.

That said promissory note was never indorsed by the Bank ; that the Corporation, to which it was made payable, has been dissolved, so that no suit at law can be maintained upon it.

A decree is then prayed for against the defendants, for the amount of the note and interest.

At December Term, 1848, the defendants filed their plea in abatement to said bill.

The plea avers that the promissory note in the bill mentioned, was discounted on the 18th day of November, 1841, by the Grand Gulf Bank, a banking corporation in the State of Mississippi, incorporated by the Legislature of said State, and thereby, then and there, became and was the property of said banking corporation, and a part of its bills receivable ; and so thenceforward remained

and continued to be until the 10th day of February, 1842. That on said last-mentioned day, said banking corporation transferred and delivered said promissary note to Lindsay and Ingraham, in violation of the statute, &c. That Lindsay having subsequently died, Ingraham and the Bank transferred said note to the said complainants, in like violation of the statute; the plea concludes in the usual form, and is verified by affidavit.

This plea was overruled by the court, and an appeal granted defendants, to the Superior Court of Chancery; which was not consummated.

A pro confesso was taken against the defendants, they having declined to answer, after the overruling of their plea; and at the May Term, 1856, a final decree was rendered against them for the amount of the note and interest.

To this decree the present writ of error is prosecuted.

*John B. Coleman,* for plaintiffs in error.

We shall endeavor to show that the decree of the vice-chancellor was erroneous;—that the transfer of the promissory note to the defendants in error was made in violation of the 7th section of the Act of 1840, and was therefore void; and that the plea in abatement should have been sustained, and the suit abated.

It was insisted in the court below, that this was no longer an open question, that the Supreme Court of the United States, in the cases of *Baldwin et al.* v. *Payne et al.,* and *Planters' Bank* v. *Sharp et al.,* 6 How. S. C. Rep. 301, had decided the Act of 1840 to be unconstitutional; and that it can therefore no longer be set up or relied upon; that by those decisions it has been overruled and swept out of existence.

We entertain a very different opinion; we deny that the Supreme Court either did decide, or could have decided the 7th section of the Act of 1840, to be unconstitutional. The extent of their decision was, that it was unconstitutional in so far as it was attempted to be applied to the contracts in the two cases then before the court. Further than this, the decision did not attempt to go; and this is manifest upon the face of the opinion itself. That opinion was delivered by Judge Woodbury, and at its very commencement (p. 318), he states the point he was about to decide, in the following

language: " The question to be considered in this case is, whether an act of the Legislature of Mississippi, passed February 21, 1840, impaired the obligation of any contract, which the State or others had previously entered into with the Planters' Bank. If it did, the clause in the Constitution of the United States, expressly prohibiting a State from passing any such law, has been violated, and the plaintiffs in error are entitled to judgment." And again, at the conclusion of the opinion (p. 334), he gives the decision of the court in these words: " This view of the Statute of 1840, being regarded as established in Mississippi, renders it clear, that in this case, as well as the case of the *Planters' Bank* v. *Sharp et al.,* the law under which this action has been abated, must be considered as having impaired the obligation of contracts, and therefore to be, in this respect, unconstitutional, and the judgment of the State Court erroneous."

It thus appears that the decision was expressly confined to the effect of the statute upon the contracts then before the court; it was held that the obligation of these particular contracts was impaired by the statute, and that it was, therefore, in that respect, and to that extent, unconstitutional. The question presented for adjudication was, did the Act of 1840 impair the obligation of the contracts in the two cases before the court? they decided that it did; and they decided nothing more. And such has uniformly, and of necessity, been the limit of their decisions upon questions presented to them under that clause in the Constitution which prohibits the States from passing laws impairing the obligation of contracts. In the cases of *McCracken & Hayward, Bronson & Kenzie,* and many others, State laws have been held unconstitutional as to the contracts before the court; for the reason, that these contracts were entered into before the passage of the laws in question, which laws were considered to have impaired their obligation. It surely cannot seriously be contended, that in such cases, the laws under consideration have been pronounced unconstitutional *in toto*. The very ground of the decisions, viz.: that they impaired the obligation of contracts made before their passage, assumes that, as to contracts made after their passage, they would be constitutional.

We assert, therefore, that the 7th section of the Act of 1840, has not been annulled by the Supreme Court of the United States;

and we insist, that when applied to cases in which it impairs the obligation of no contract entered into before its passage, it is as valid and binding as any law upon the Statute Book. And just such a case, we think, we can demonstrate the present one to be; and we think we can not only demonstrate that neither of the reasons for which, in *Baldwin, Vail & Hufty* v. *Payne,* and *Planters' Bank* v. *Sharp,* the Supreme Court held that the obligation of those contracts was impaired by the Act of 1840, have any application to this case, but that upon the principles which the Supreme Court there recognized, were this case now presented to them, they would be compelled to decide, that no contract involved in it has been impaired by that Act. And before proceeding with our argument, it is important that we should bear in mind the character of the contracts, whose obligation was decided in the two cases referred to, to have been impaired by the Act of 1840. They were, both of them, notes made to, and discounted by, the Planters' Bank before the passage of the Act of 1840. The note, in the · *Baldwin, Vail & Hufty* case was, in reality, discounted by the Mississippi Railroad Company of Natchez, but as the charter of that company gave it no specific banking powers, but conferred upon it generally " all the usual rights of banking, which are permitted to banking institutions within the State," the counsel of *Baldwin, Vail & Hufty* selected the charter of the Planters' Bank as the one upon which they would rely, and it was, therefore, the only one considered by the court; and both cases were argued and decided as though the notes had been made to, and transferred by, the Planters' Bank. ·

The court, as we have seen, decided that the obligation of these contracts was impaired by the Act of 1840; and they rest their decision upon the two following grounds, and upon these alone:—

First. That, by the charter of the Planters' Bank, the power to transfer its promissory notes and evidences of debt, was expressly conferred upon it, and could not, therefore, be taken away by subsequent legislation.

Second. That the promissory notes in question had been made and delivered to the bank before the passage of the Act of 1840; and that, as the general law of the State, then in force, authorized the transfer of promissory notes, the bank took them with the

incident of negotiability attached to them, as a part of the contract, which incident it was not competent for subsequent legislation to divest.

We will now proceed to notice, in their order, the bearing of these two propositions upon the case at bar :—

I. That the charter of the Planters' Bank contains an express grant of power to transfer its promissory notes and bills receivable.

Our first position is, that the construction given by the Supreme Court of the United States to the charter of the Planters' Bank, is not binding upon this court. That this court has put its own construction upon that charter; which construction, having never been modified or overruled, is therefore the law of this State, and binding upon its courts until modified or overruled by a competent tribunal, which tribunal is the High Court of Errors and Appeals of Mississippi alone.

The language of the Act of Congress of the 24th September, 1789 (Ingersoll's Abridgment, 94, sec. 25), which confers upon the Supreme Court of the United States the power to revise the decision of the Supreme Court of a State (so far as said act is applicable to the case at bar), is as follows :—

"A final judgment or decree in any suit in the highest court of law or equity of a State in which a decision in the suit could be had, where is drawn in question the validity of a statute of any State, on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of such its validity, may be re-examined, and reversed or affirmed in the Supreme Court of the United States, upon a writ of error," &c.

In order to determine whether the statute of a State is repugnant to the Constitution, it is first necessary to fix upon the meaning of the statute, to give a construction to it. The question then arises, how, and by whom, is this meaning to be fixed upon? By what tribunal is this construction to be given? The answer is to be found in a continuous train of adjudications of the Supreme Court of the United States itself, commencing in the year 1797, and adhered to with unbroken uniformity, except when the Constitution or laws of Mississippi were to be construed.

"State laws," says the Supreme Court of the United States,

"are to be construed by the State tribunals," and for the reason that "a fixed and received construction by a State, in its own courts, makes a part of the statute law." 2 Dallas, 344; 5 Cranch, 22; 9 Ib. 87; 2 Wheat. 316; 6 Ib. 119; 10 Ib. 152; 11 Ib. 361; 12 Ib. 153; 1 Pet. 360, 501, 505, 571; 2 Ib. 85, 670, 675; 3 Ib. 127; 4 Ib. 124; 5 Ib. 264, 398; 6 Ib. 291.

The case last cited, *Green* v. *Lessee of Neal*, 6 Pet. 291, recognizes, to the fullest extent, the exclusive right of the State courts to construe the State statutes, and the obligation of the Supreme Court of the United States to follow that construction, whether they approve of it or not. The question there arose under a Statute of Limitations of Tennessee. A construction had been given to it some years previously, by the then Supreme Court of Tennessee, which, in the cases of *Patton* v. *Easton*, and *Powell* v. *Green*, the Supreme Court of the United States had followed; and stated, in their opinion, that they "approved of the construction given to the statute by the Tennessee court." Subsequently, the Supreme Court of Tennessee overruled their former decision, and put a construction upon the statute diametrically opposite to that which had received the sanction of the Supreme Court of the United States; and thereupon the Supreme Court of the United States overruled their two previous decisions, and followed the last one made by the Supreme Court of Tennessee. A few extracts from the opinion delivered in the case by Judge McLean, will show that we speak by the book, when we say, that the exclusive right of the State courts to construe their State laws, had been most fully recognized by the Supreme Court of the United States.

At page 298, the court say, in regard to a question arising under a State law : "The decision of this question by the highest tribunal of a State, should be considered as final by this court; not because the State tribunal, in such a case, has any power to bind this court, but because, in the language of the court, in the case of *Shelby et al.* v. *Guy*, 11 Wheat. 361, a fixed and received construction by a State in its own courts, makes a part of the statute law. The same reason which influences this court to adopt the construction given to the local law, in the first instance, is not less strong in favor of following it in the second, if the State tribunals should change the construction." Again, at page 299 : "Are not the injurious effects on the

McIntyre et al. *v.* Ingraham et al.

interests of the citizens of a State, as great, in refusing to adopt the change of construction, as in refusing to adopt the first construction? A refusal in the one case, as well as in the other, has the effect to establish in the State, two rules of property." Again, at same page: " The exposition forms a part of the local law, and is binding on all the people of the State, and its inferior judicial tribunals. It is, emphatically, the law of the State, which the Federal Court, while sitting within the State, and this court, when a case is brought before them, are called to enforce." And again, at same page: " As the Federal tribunals profess to be governed by this rule, they can never act inconsistently by enforcing it. If they change their decision, it is because the rule on which that decision was founded has been changed."

Let us now apply the foregoing principles to the point immediately under discussion. The charter of the Planters' Bank is, of course, a statute of Mississippi,—a law passed by the Legislature of the State of Mississippi. In January, 1848, the construction of this statute of Mississippi is before the Supreme Court of the United States, and the question presented is: Does that statute confer upon the Planters' Bank the power to transfer its bills receivable? The same question had been previously presented to the High Court of Errors and Appeals of Mississippi, and that court, at its November Term, 1844, in an opinion delivered by the then Chief Justice, the reasoning of which has never been refuted, nor its logical deductions, in the slightest degree shaken, unanimously decided that the statute did not confer such power upon the bank, either expressly or by implication. That decision had never been retracted or qualified, and was in full force and unreversed in January, 1848, when the question was considered by the Supreme Court of the United States. The conclusiveness of the construction given to the charter by the High Court, was considered by the counsel of the defendants in error to have been so irrevocably established by the previous adjudications of the Supreme Court of the United States, that they hardly deemed it necessary to argue the question of construction at any length. It was looked upon by them as *res judicata.* Indeed, the only reply made by Mr. Webster, as counsel of the defendants in error, to the argument upon the construction of the charter, made by the counsel of the

McIntyre et al. *v.* Ingraham et al.

plaintiffs in error, was as brief and as comprehensive as the "*veni, vidi, vici,*" of the Roman conqueror. After recapitulating the points presented by the opposing counsel upon the construction of the charter, his answer was: "But the Court of Mississippi did not think so."

And yet, conclusive as were the decisions of the Supreme Court of the United States on this point, it was disposed of in the most unceremonious manner by Judge Woodbury. All that he says on the subject is: "It ought, perhaps, to be added, that the courts of Mississippi once put a more limited construction on this charter. *Baldwin et al.* v. *Payne et al.*, 3 Sm. & Mar. 661. But as that very case is now before us for revision on the ground that it was erroneous, we feel obliged, for that and other reasons, which need not be here enumerated, to put such construction on the charter, and on the law supposed to violate it, as seems right, according to our own views of their true intent." *6 How. 324.*

We abstain from any comment upon this part of the opinion; and, returning to the decisions which we have cited above, and in which the point at issue is not only decided, but is reasoned, and reasoned most ably, we ask, If "State laws are to be construed by the State tribunals?" If "the decision of such a question, by the State Court of the last resort, should be considered final by the Supreme Court of the United States?" If "the construction by the highest State court, of its own statutes, makes a part of the statute law?" If "such exposition forms a part of the law?" If "it is emphatically the law of the State which the Supreme Court of the United States is called to enforce?" If all, or any of these propositions be true, can the construction of the charter of the Planters' Bank be held to have been an open question? Could it have been legitimately entertained by the Supreme Court of the United States? Had it not already been settled by the only tribunal having jurisdiction of it—the High Court of Mississippi? And have we not a right to insist, under the decisions of the Supreme Court of the United States alone, and irrespective of any other reason, that this court is not bound to abandon its construction of the charter of the Planters' Bank, and adopt that put upon it by the Supreme Court of the United States?

But there is another reason which, to our mind, is still more con-

clusive: why this court is not bound by the construction given to the charter of the Planters' Bank, by the Supreme Court of the United States. The construction of a State law is not, and cannot be, a constitutional question. It is not, therefore, a question of which the Supreme Court of the United States has appellate jurisdiction. If the State law, with the construction put upon it by the State Courts, which say the Supreme Court is a part of the law, violates any provision of the Constitution of the United States, the Supreme Court of the United States has, beyond all doubt, jurisdiction to declare such law, so construed, unconstitutional. But it must take the law with the construction given to it by the State courts. It has no more power to reject the construction, than it has to change the phraseology of a statute.

In *Groves and Slaughter, Robertson and Coalter, Harris and Reynolds*, and other cases, the Supreme Court of the United States has given to the Constitution and statutes of Mississippi, a totally different construction from that given to them by the High Court. In all these cases, this court has adhered to its own construction, regardless entirely of the opinions of the Supreme Court; and its power, as well as its duty to do so has not been, and cannot be, questioned. Is there in principle, any distinction between these cases, and the point in this case now under discussion? If there be, we are too obtuse to discover it. The Supreme Court of the United States either has appellate jurisdiction over this court, in all cases involving the construction of the statutes of Mississippi, or she has it in none: we hold that she has it in none. In *Deans* v. *McLendon*, 1 George, 360, the present Chief Justice, in delivering the opinion of the court, uses this emphatic language:—

"We may, therefore, as the appellate tribunal of the State, justly claim the right, in exclusion of all other courts, to determine the construction which should be applied to those acts of the Legislature passed for the good government of the citizens, and the welfare and safety of the commonwealth; and also to declare and enforce the public policy established by the laws. Hence, however great the respect and deference which may be due to the decisions of the Supreme Court in all cases—and which we willingly pay— we are not bound, and will not yield our well-matured and clear convictions in reference to the construction of our domestic stat-

utes, to the opinions of that tribunal. We could not do so without grossly betraying the rights of the community, which it is our solemn duty to protect."

This is decisive. This court alone has jurisdiction to construe the statutes of Mississippi.

It was argued in the court below, that this court has since receded from the construction given by it to the charter of the Planters' Bank, and adopted that put upon it by the Supreme Court of the United States; and the cases of the *Grand Gulf Bank* v. *State of Mississippi*, 10 S. & M. 428; *Montgomery et al.* v. *Galbraith et al.*, 11 Ib. 555, and *Ingraham* v. *Grigg et al.*, 13 Ib. 29, were relied upon as sustaining the position. An examination of these cases will show that in neither of them was any question made by counsel, or decided by the court, upon the construction of the charter either of the Planters' Bank, or the Grand Gulf Bank. The first of these cases, the *Grand Gulf Bank* v. *The State*, 10 S. & M. 428, was an appeal from a judgment of forfeiture upon a *quo warranto* proceeding, in which the bank was ordered to deliver to the trustees, who had been appointed on the rendition of the judgment, "all the property, notes, bonds, and choses in action of the bank." On this point, the court say: "Previous to the institution of the proceedings in this case, the bank had made a general assignment of its property and effects. Under the construction of the Act of 1840, prohibiting assignments by the banks, heretofore placed upon it by this court, such assignment was void. But the Supreme Court of the United States has reversed the decision of this court upon that point, on the ground that the Act of 1840 was unconstitutional. In cases of that character, that court bears the relation of an appellate tribunal to this, and we feel bound to conform to its construction of the Constitution of the United States, when made upon direct appeal from this court. Of consequence, the right of the assignees under this deed of assignment set forth and admitted in the pleadings, is paramount to that of the trustees appointed by the court, upon the rendition of the judgment of forfeiture. They could take only what did not pass by the deed of assignment."

It thus appears that the construction of the charter of the bank was not in question, and that no decision was made upon it.

Although the decision of the court was perfectly correct, yet its language is too broad in saying that its decision had been reversed by the Supreme Court of the United States, " on the ground that the Act of 1840 was unconstitutional;" we have already shown that the Act was only pronounced unconstitutional in its application to the cases then before the court; and that it was not, and could not have been held to be unconstitutional *in toto*. We have said that the decision itself was correct; and it was so, wholly irrespective of the construction that might be given to the charter of the bank, and for this reason: one point decided by the Supreme Court of the United States was, that as by the general law of Mississippi, in force at the time the Act of 1840 was passed, all notes, &c., were made negotiable, this incident of negotiability attached to such as were discounted by a bank before the passage of the act, and formed a part of the contract between the maker of the note and the bank, and that the Legislature could not divest the contract of that incident, without impairing its obligation. This point was within the legitimate jurisdiction of the Supreme Court of the United States, and its decision upon it was binding on this court. There being nothing in the record to show that the notes, &c., assigned, had not been discounted by the bank before the passage of the Act of 1840, the court was bound to hold that the assignment was valid; and this too, even though they might at the same time have held, that the charter of the bank contained no grant of power to make such assignment.

The second case, *Montgomery et al.* v. *Galbraith et al.*, 11 S. & M. 555, was an action of detinue brought by the trustees of the Planters' Bank against the assignees of the bank, to recover a promissory note, a certificate of stock, and a deed. All that the court say in regard to the question of the assignment is: " The views of this court were expressed on this subject, in the case of *Payne et al.* v. *Baldwin*, 3 S. & M. 661. That opinion was reversed in the Supreme Court of the United States, and we have since conformed to their decision." The charter of the bank is not alluded to; and, as in the former case, the decision was correct. No question was made as to the time when the note sued for was discounted; its date is not even given in the report of the case, but

we understand the fact to be, that it was the property of the bank long before the year 1840.

The third case, *Ingraham* v. *Grigg et al.*, 13 S. & M. 29, was a bill filed by Ingraham, as assignee of the Grand Gulf Bank, to enjoin a levy made by Grigg on real and personal property embraced in the deed of assignment. No question upon the construction of the charter, or the Act of 1840, was made ; nor could either of these questions have been raised, as nothing was involved in the case, but the right of the bank to assign the real and personal estate levied on; the assignment was attacked on the grounds of fraud, the non-delivery of the deed, and its want of proper authentication ; its validity was sustained by the court, but nothing was decided either as to the charter, or the Act of 1840.

The construction, then, which in *Payne et al.* v. *Baldwin et al.*, 3 S. & M. 661, was given to the charter of the Planters' Bank, has never, to this day, been overruled or modified by this court; and, if we are correct in the position that the Supreme Court of the United States has no power to control the High Court of Mississippi in the construction of the Statutes of Mississippi, it follows, that the charter of the Planters' Bank must still be held by the courts of this State to contain no grant of power to transfer its bills receivable.

If, however, we should be in error in this—if it should be held that the construction given by the Supreme Court of the United States to the charter of the Planters' Bank, has reversed and annulled that given to it by this court; if this court shall now decide, that in the construction of the acts of the Legislature of Mississippi, it is bound implicitly to adopt that which may be given to those acts by the Supreme Court of the United States—then,

Our second position is, that the charter of the Grand Gulf Bank contains no grant of power to transfer or assign its promissory notes.

This charter is entirely different in its provisions from that of the Planters' Bank; and it must be borne in mind that it has never been construed by the Supreme Court of the United States. We assume, therefore, that it is, for the present at least, open to examination and construction by this court. It is true, that in the argument in the court below, the case of *Ingraham* v. *Marshall*,

12 How. 166, was cited for the purpose of showing, that if the charter of the Grand Gulf Bank had been submitted to the Supreme Court for construction, it would have received the same which was given to that of the Planters' Bank. It is a sufficient reply to this assumption to say, that in that case, the charter of the bank was not, and could not have been, in any way, adjudicated upon by the court; the case was dismissed for want of jurisdiction, and of course, there neither was nor could have been any decision upon the merits.

What the Supreme Court has decided, is this: If a bank is empowered by its charter to transfer its bills receivable, that power cannot constitutionally be taken away by subsequent legislation. This is the decision of a constitutional question, and is binding on the State Courts. Whenever, therefore, it is decided by the court having final jurisdiction to construe a bank charter, that such charter confers upon it a particular power, the attempt by subsequent legislation to take away that power, impairs the obligation of the charter contract, and is, therefore, in violation of the Constitution of the United States. This is the substance of the decision in the cases in 6 How. 301, and to this extent we admit the decision to be the law of the land, and binding upon the State Courts. If, then, the charter of the Grand Gulf Bank shall be held by this court to confer on it the power to transfer its bills receivable, we admit at once, and without any qualification, that the 7th section of the Act of 1840, which prohibits such transfers by banks, has no application to the Grand Gulf Bank. And we make this admission without any apprehension of the result, feeling entire confidence that we can demonstrate not only that no such grant of power is expressly conferred by the charter, but that it cannot be implied without rendering the charter inconsistent with itself, and actually nullifying a very important portion of it. To the examination of the charter we now ask the particular attention of the court.

The following portion of the 2nd section of the charter of the Grand Gulf Bank, is relied on by the defendants in error as conferring on the bank the power to transfer its bills receivable. It is in these words: " And by that name they shall be capable, in law, of purchasing and possessing lands, tenements, and hereditaments,

and personal estate of any kind whatever, to an amount not exceeding the sum of one million of dollars, beside the cost of constructing the railroad and appurtenances thereto hereinafter mentioned, and the same may sell and dispose of at pleasure." This latter clause, "and the same may sell and dispose of at pleasure," it is insisted, confers upon the bank the express power to sell and transfer its bills receivable. The argument is this: The Supreme Court of the United States in construing the charter of the Planters' Bank, decide that the words "effects of what kind and nature soever" as used in that charter, include all choses in action; and that the grant of power to "sell and dispose of effects of what kind and nature soever," is a grant to the Planters' Bank of power to sell and transfer its choses in action. Therefore, the words "personal estate of any kind whatever," used in the charter of the Grand Gulf Bank, being (assumed to be) more comprehensive than the term "effects" used in the charter of the Planters' Bank, these words "personal estate" must likewise be held to include choses in action.

This deduction we look upon as one of the happiest illustrations of a *non sequitur*. The argument assumes that the definition of words is a constitutional question; or, at least, that whenever in any case involving a constitutional question, the Supreme Court of the United States decides that a particular word has a particular signification, that signification, irrespective entirely of the connection in which it is used, and no other, must ever afterwards be given to it in all the courts of the Union. This is certainly the proposition contended for. In construing one State law, the Supreme Court decides that the word "effects" was intended to embrace choses in action; therefore, in the construction of every other State law, in which the word "effects" or any other word equally comprehensive may happen to occur, all the courts in the United States are compelled to hold that such word includes choses in action. We think this is pressing the appellate jurisdiction of the Supreme Court rather too far, and we are disposed to believe that this court will think so too. Our idea is, that in construing a State law, the State Courts not only have the right, but that they are bound by their oaths, to put upon the word "effects," or upon any other word more or less comprehensive which may be used in such law, pre-

McIntyre et al. *v.* Ingraham et al.

cisely such an interpretation as in their judgment shall be proper, and in accordance with the intention of the Legislature, without any regard to the construction which may have been given to such word by any other court whatever.

Let us now take the charter of the Grand Gulf Bank, and see what powers the Legislature intended to confer, and did confer, upon it by this 2d section. The entire section is as follows:—

"That so soon as the sum of $150,000 shall be subscribed, the subscribers and their successors and assigns shall be a body politic and corporate, by the name and style of the 'President and Directors of the Grand Gulf Railroad and Banking Company,' and shall so continue until the last day of December, in the year 1863. And by that name they shall be capable, in law, of purchasing and possessing lands, tenements, and hereditaments, and personal estate of any kind whatever, to an amount not exceeding the sum of one million dollars, besides the costs of constructing the railroad and appurtenances thereto hereinafter mentioned, and the same may sell and dispose of at pleasure. And they shall, by said name, be capable and liable to sue and be sued, and plead and be impleaded in any suit or action in law or equity. And they may also ordain, establish, and put in execution such by-laws, ordinances, and regulations, not contrary to the laws of this State or of the United States, as they may deem necessary and expedient, and, in general, do all such acts, and exercise such powers, as are usually incident to bodies politic and corporate."

Chancellor Kent (1 Kent's Comm. 461) says: "It is an established rule, in the exposition of statutes, that the intention of the lawgiver is to be deduced from a view of the whole and of every part of a statute, taken and compared together. The real intention, when accurately ascertained, will always prevail over the literal sense of the terms."

If it were the intention of the Legislature, in giving the Grand Gulf Bank power to purchase and sell personal property, to invest it thereby with the power of purchasing and selling notes and bills, is it not passing strange that they should have thought it necessary to confer a part of this same power over again, as they have done in sections 13 and 15 of the charter?—section 13 authorizing the bank to discount promissory notes, and section 15 authorizing it

to deal in exchange and in bank and other stocks. If the construction of the 2d section, which is contended for by the opposite counsel, be correct, the bank, under that section, was already possessed of all the powers, and more too, conferred by the 13th and 15th sections. Why, we ask, did the Legislature confer the power a second time? Is it not equally strange, if it were the intention of the Legislature to give the bank authority to transfer its promissory notes and bills of exchange, that it should not have done so in connection with the grant of authority to discount notes and to deal in bills of exchange? The 13th and 15th sections, in which notes and bills are treated of, and where the powers and duties of the bank in regard to them are laid down and defined, would, to say the least, have been a more appropriate place than the 2d section, where the general corporate franchises alone are granted, and where not one word is said in relation to the banking powers and duties of the corporation.

Again, if the authority to sell and dispose of personal estate is a grant of power to transfer promissory notes and bills, the authority to purchase and hold personal estate is a grant of power to discount promissory notes and bills. It follows, then, that every bridge, hotel, turnpike, and railroad company; every lodge of Masons, Odd Fellows, and Sons of Temperance; and every religious and literary corporation, which is authorized by its charter to purchase and dispose of property (and all that we have examined contain some such provision), has a constitutional right to engage at once in the banking business. The power to purchase and hold property being an authority to discount notes and deal in exchange, they may, unless they are restricted to purchasing for cash, issue their own notes in payment or exchange for those they discount, and thus engage in a general banking business; and, if any attempt is made to restrain them, they can point to their charters, and entrench themselves behind the obligation of the charter contracts. But we will not press this argument farther. We have a much stronger one to rely upon. We will now show that the charter of the Grand Gulf Bank, itself, contains a complete refutation of the construction which the opposite counsel contend for.

The 2d section of the charter authorizes the bank to purchase and possess lands, tenements, and hereditaments, and per-

sonal estate of any kind whatever, to an amount not exceeding the sum of one million dollars, besides the cost of constructing the railroad, &c.

The 8th section fixes the capital stock at the sum of one million of dollars, exclusive of the costs of constructing the railroad, &c.

The 15th section authorizes the bank to issue its notes to twice the amount of the capital paid in.

The capital stock being one million of dollars, and the bank being authorized to issue its notes to twice the amount of its capital, it is therefore authorized to issue notes to the amount of two millions of dollars. Now, if the bills receivable of the bank are embraced in the term personal estate in the 2d section, it follows that the bank can only purchase and hold in lands, personal property, notes and bills altogether, to the value of one million of dollars. What, then, is the bank to do with the other million of dollars which she is authorized to issue? She can do nothing with it unless she gives it away; she can neither buy lands, negroes, stocks, bonds, bills, or notes, because, having purchased to the amount of one million of dollars, she has got to her limit of real and personal property. The bank is thus deliberately empowered by the Legislature to issue her notes to the amount of two millions of dollars, and is, at the same time, as deliberately prohibited from making any use of one-half of that amount.

The only answer to this position, which was attempted in the court below, was this: That the 2d section authorizes the bank to purchase and possess property to the amount of one million of dollars, besides the costs of constructing the railroad and its appurtenances; that these costs would amount to fully one million of dollars, which must be added to the one million specifically mentioned in the same section, thus making two millions of dollars worth of property which the bank was authorized to purchase and possess, being the exact amount of the notes she was authorized to issue.

This answer was ingenious, but it won't stand examination. The 8th section of the charter is similar in this respect to the 2d section. It fixes the capital stock of the bank at one million of dollars, also exclusive of the costs of constructing the railroad and its appurtenances. If, then, the one million of dollars assumed to be the costs of constructing the road, is to be added to the amount of the

property to which, by the 2d section, the bank is limited, it must also be added to the amount of the capital stock fixed by the 8th section. The case will then stand thus : including the costs of the road, the bank is authorized to purchase and possess property to the amount of two millions of dollars ; and her capital stock is also two millions of dollars, including the costs of the road. Being authorized to issue her notes to twice the amount of her capital, she can issue to the amount of four millions of dollars, for two millions of which she is prohibited from receiving anything in return. This seems to us to make the case worse instead of better.

The intention of the Legislature, in authorizing the bank to issue her notes to twice the amount of her capital, was to increase the circulation of the country to that extent. Her bills receivable were never intended to be considered as constituting a part of the personal property spoken of in the 2d section, and they never were so considered, either by the bank or any one else, until after the passage of the Act of 1840. The intention of the restrictive clause in the 2d section is equally clear ; it was to prohibit the bank from acquiring beyond a certain amount of property—of property in its ordinary acceptation—lands, negroes, horses, mules, &c.—to prohibit it from using its capital, as was so much complained of against many of the old English corporations, in buying up and concentrating in itself all the most valuable property in the country. It is strictly a restraining clause, and yet the ingenuity of counsel seek to convert it into a grant of unusual and unnecessary powers.

One of the rules laid down by Blackstone for the construction of statutes (1 Blackst. 89) is, that " one part of a statute must be so construed by another, that the whole may, if possible, stand, *ut res magis valeat, quam pereat.*" Apply this rule of construction to the charter of the Grand Gulf Bank, and we have no more to ask. The result must be, that it does not confer upon the bank the power to transfer its choses in action.

In the opinion delivered by Judge Woodbury (6 How. R. 321), one of the arguments used by him to show that the charter of the Planters' Bank conferred upon it the express power to transfer its bills receivable, is that by the 22d section of its charter, the bank was prohibited from discounting any notes not made pay-

able and negotiable at said bank; and he asks, "Why made negotiable, if no right was to exist to negotiate or transfer them?" The answer to the learned judge's inquiry is very simple: they were required to be made payable and negotiable at the bank, to prevent the bank from buying up any paper that was not made for the express purpose of being discounted by it; to prevent it from going into the market as a broker; and the term negotiable was meant. to apply only to the negotiation of the paper by the makers to the bank, and not to any subsequent negotiation of it by the bank; and every man who transacted business with the banks, knows this. But the argument has no application in this case. There is no such provision in the charter of the Grand Gulf Bank. Indeed, the word negotiable is not to be found in it. The influence, therefore, which that clause exercised, in producing the construction which was given to the charter of the Planters' Bank, cannot be exercised upon the construction of that of the Grand Gulf Bank. Indeed, the note which is the foundation of this suit, is not only not made negotiable, but it is not even payable to order.

At pages 322, and 323, of the opinion, the learned judge argues at some length, that under the grant of general and usual banking powers, conferred by its charter, the Planters' Bank possessed the right to transfer its bills receivable; this, however, was but the individual opinion of the judge himself; the remainder of the court did not concur in it. At page 324, he says: "But to avoid differences of opinion, we place the right here solely upon the express grant." It is unnecessary, therefore, to occupy time in showing the unsoundness of the judge's argument on this point. This, indeed, has already been done, and done most conclusively, by the late Chief Justice in the opinion delivered by him in 3 S. & M. 676, 677.

Having thus presented our views as to the true construction of the charter of the Grand Gulf Bank, and having, as we think, shown that it does not, according to any recognized rule of interpretation that can be given to it, confer upon the bank the power to transfer its choses in action, we will now proceed to the consideration of the second and last ground upon which the Supreme Court of the United States base their decision in *Baldwin* v. *Payne*, and the *Planters' Bank* v. *Sharp*.

II. That second ground is, that the notes sued on in these cases had been made and delivered to the Planters' Bank before the passage of the Act of 1840; that as the general law of the State in force at the time of their delivery made all promissory notes negotiable, the bank took them with the incident of negotiability attached to them, as a part of the contract of the makers with her; and that this incident could not be divested, without impairing the obligation of the contract.

We have already admitted, and we again admit, that this branch of the decision, erroneous as we conceive it to be, is binding on this court; and thus recognizing its validity, we assert, and will demonstrate, that it is decisive of this case in favor of the plaintiffs in error; unless a different construction from that which we anticipate, shall be given to the charter of the Grand Gulf Bank.

The note sued on in this case is dated, and was delivered to the Grand Gulf Bank, on the 18th day of November, 1841; the Act of 1840 was passed on the 21st day of February, 1840, twenty-one months previously.

We suppose we may safely assume, that if the law in existence at the time when the notes of Payne and Sharp were made and delivered to the Planters' Bank, constituted a part of the contract between the makers of those notes and the bank, the law in existence when the note in this case was made and delivered to the Grand Gulf Bank, in like manner constituted a part of the contract between that bank and the plaintiffs in error.

At the time this note was made and delivered (the 18th of November, 1841), what was the law of Mississippi in regard to its negotiability? It unquestionably was, that it could not be transferred. The Act of 1840, so far certainly as it regulated contracts made after its passage, was in full force and effect; it was the law under which this contract was made; and indeed, the note in question appears to have been drawn with special reference to its provisions, as it is made payable simply to the president and directors of the bank, and not, as was customary, to their order. The Grand Gulf Bank, then, under the decision of the Supreme Court of the United States, took this note with the incident of nonnegotiability attached to it, as a part of her contract with the makers, which incident, under the same decision, it would be un-

McIntyre et al. *v.* Ingraham et al.

constitutional to attempt to divest. Can this conclusion be resisted? Not, certainly, by those whose sole reliance is on the decision of the Supreme Court, for it is recognized and asserted throughout the entire decision.

At page 324, the court say, "what law existed on this point when the note was actually transferred, is not the inquiry; but what existed when it was made, and its obligations as a contract were fixed." Again, on the same page, " This contract, then, by the bank with the maker, when executed, enabled the former to sell or assign it, and the indorsee to collect it, not only by its express terms, but by the general law of the State, then allowing transfers of negotiable paper, and suits in the name of indorsees." Again, at page 328, " The case in 8 Robinson, 421, appears also to have been one on a note executed after the prohibitory law, and not, as here, before." And again, at page 330, in referring to State laws which had been cited in argument as having been held by the Supreme Court to be constitutional: " But it will usually be found that these are such laws only as relate to future contracts, or, if to past ones, relate to the form of remedy," &c.

To press this point farther is unnecessary; it is too clear to require or justify argument or illustration. In conclusion, then, and by way of recapitulation, we submit these propositions:—

First. That the High Court of Errors and Appeals of Mississippi, is not bound to adopt the construction put by the Supreme Court of the United States upon the charter of the Planters' Bank of Mississippi; that the true construction of that charter having been determined upon (3 S. & M. 661) by the court which alone had jurisdiction to pronounce it, is final, and must be received as such, until reversed by the tribunal which gave it.

Second. That if the construction given by the Supreme Court of the United States to the charter of the Planters' Bank is conclusive, the construction of the charter of the Grand Gulf Bank is still an open question, which this court has full power to decide.

Third. That the charter of the Grand Gulf Bank is essentially different from that of the Planters' Bank, and does not confer upon the Grand Gulf Bank, either expressly or by implication, the power to transfer its choses in action.

Fourth. That the note sued on in this case, having been made

and delivered to the Grand Gulf Bank long after the passage of the Act of 1840, the character of its obligation as a contract is governed by that act, and it could not, therefore, be legally transferred.

And, as a consequence of these propositions, we insist that the transfer of the note in question to the defendants in error, was illegal, and passed no title to them; and that the plea in abatement should therefore have been sustained by the court below, and the suit abated.

*W. S. Wilson*, for defendants in error.

Thomas G. McIntyre and William Bridgers, on 18th of November, A.D. 1841, made their note for $4842 73, payable three hundred and seventy days after date to the Grand Gulf Bank.

The bank, by deed of assignment, executed in 1842, assigned the note to trustees in trust for the payment of its debts. The trustees brought their bill in the Vice-Chancery Court at Natchez, against McIntyre and the executor of the will of William Bridgers, who had died, to recover the amount of the note.

The defendants interposed the plea, that the note had been assigned contrary to the provision of the Statute of 1840, forbidding transfers by banks of their notes. This plea was overruled, and a final decree ultimately given.

The point arising in the record therein, to be relied on is, that the District Chancery Court erred in overruling the plea.

And truly, after the decisions of the Supreme Court of the United States, in *Planters' Bank* v. *Sharp*, and *Baldwin, Vail et al.* v. *Payne*, 6 How. R. 301; Ib. 332; and the repeated recognitions of them by this court, the question is not now open to argument.

In those cases, two questions were distinctly presented to the Supreme Court of the United States, and decided:—

1. That the Act of 1840 was void, in that it violated the charter contract made by the State of Mississippi with the Bank and Mississippi Railroad Company, by which it was stipulated, that they should have the right "to have, possess, receive, retain, and enjoy lands, rents, tenements, hereditaments, goods, chattels, and effects, of what kind soever, nature, and quality, not exceeding $6,000,000,

including the capital stock, &c.; and the same to grant, demise, alien, or dispose of for the good of said Bank."

2. That the act was void in violating the contract sued on, the note being negotiable on its face, and having been made before the act was passed.

The decision on the first point was that promissory notes were included in the word "effects," and being such, the bank had the right to take and "dispose" of them, by virtue of the contract contained in the charter; and the Act of 1840 invaded that right and impaired the contract, because as interpreted by our courts, it would cause any suit brought by any person after an assignment, to be abated, *toties quoties*, as often as brought. Thus the contract would be rendered useless and unavailable, and the right of disposition for any practical purpose become nugatory.

The charter of the Grand Gulf Bank, passed December, 1833, sect. 2, provided that the corporation should be "capable, in law, of purchasing and possessing lands, tenements, and hereditaments, and personal estate of any kind whatever, to an amount not exceeding, &c., and the same may sell and dispose of at pleasure."

The words "personal estate," certainly are as broad and comprehensive as the word "effects," in the Planters' Bank charter, and the right of disposition as full and unlimited, for it is to sell and dispose of at pleasure.

And that no distinction exists between cases arising in this charter, and that before the court in 6 Howard, clearly appears from *Grand Gulf Bank* v. *Marshall*, 12 Howard S. C. Rep. 167, where Chief Justice Taney, delivering the opinion upon the question of jurisdiction, said, "if the Record brought that question (that is, whether the charter contract between the bank and the State was violated) before us, undoubtedly we should have jurisdiction, and the judgment of the State court could not be maintained; for it is the same question decided in *Planters' Bank* v. *Sharp*, 6 How. 301, and *Baldwin* v. *Payne*, 6 How. 332."

This court has repeatedly taken the same view. *Grand Gulf Bank* v. *State*, 10 S. & M. 428—9; *Same* v. *Wood*, 12 S. & M. 482; Ib. 486.

The fact that the note in this case was made after the Act of 1840 was passed, can have no effect upon the decision. It might

possibly upon the second question decided by the case in 6 Howard, to wit, that the contract of the maker of the note was violated, if that was raised and relied on, in the case. For it might be said that inasmuch as the note was made after the enactment, the law entered into the contract, forming a part of it, and taking away negotiability.

But that is not the question. The true question is, was the contract contained in the charter violated? Was not the promissory note "personal estate?" Had not the bank the right to take and possess it? Had she not the right to "dispose of it?" Did not the Act say that if it was disposed of or sold in the only way in which a disposition could be made for any useful purpose, " by indorsement or otherwise," that no suit should be maintained upon it? Clearly affirmative answers must be given, and that being so, by the decision of the Supreme Court, the contract was violated and the Act unconstitutional and void.

HANDY, J., delivered the opinion of the court.

The case presented by the record before us is this: On the 18th November, 1841, the plaintiffs in error executed their promissory note to the President and Directors of the Grand Gulf Railroad and Banking Company, a bank of this State, incorporated by the Legislature in the year 1833, by whom the note was assigned by deed of assignment on the 31st December, 1842, to the defendants in error, who brought this suit to recover the amount of it.

The plaintiffs in error pleaded, in abatement to the suit, that the note was assigned by the bank, in violation of the statute of this State, passed on the 21st February, 1840, which enacts, that "it shall not be lawful for any bank in this State, to transfer, by indorsement or otherwise, any note, bill receivable, or other evidence of debt; and if it shall appear in evidence, upon the trial of any action upon any such note, bill receivable, or other evidence of debt, that the same was transferred, the same shall abate on the plea of the defendant."

The title of the defendants in error to the note, is based upon the assignment to them; and the question is thus presented, whether the defendants in error acquired, by the assignment, such a title as

would enable them to maintain an action thereupon in their own names?

On the one hand, it is insisted that the assignment was in violation of the Statute of 1840, and is illegal and void, and that no right of action passed by it. On the other hand, it is contended, that that Act was a violation of the right vested in the bank by its charter, to transfer and dispose of its property, including promissory notes; and that the statute, being an impairing of the contract between the State and the bank under the charter, was unconstitutional and void. It is admitted that the Statute of 1840 is constitutional and valid, except so far as it impairs the right granted to the bank by its charter to transfer its evidences of debt.

It is to be observed, that the note in question was made and delivered to the bank after the passage of the Act of 1840; and hence, no question arises as to the unconstitutionality of that Act on the ground that it impaired the right of assignment existing by the general law at the time of the execution of the note, and which entered into and became an incident to the contract. The case, therefore, turns upon the single question—whether, by the terms of the charter, the right to assign promissory notes is among the powers granted to the bank; and this involves two points for consideration,—1st: whether the power is *expressly granted* in the charter; and, 2d: whether it is *necessary* to the exercise of any of the powers expressly granted, and therefore arises by implication.

1. The power is claimed as expressly granted by the 2d section of the charter, which provides that the corporation, "shall be capable in law of purchasing and possessing lands, tenements, and hereditaments, and personal estate of any kind whatever, to an amount not exceeding the sum of one million of dollars, besides the cost of constructing the railroad and appurtenances thereto hereinafter mentioned, and the same may sell and dispose of at pleasure." It is said that the power thus granted—to "purchase and possess *personal estate of any kind whatever*," and "to sell and *dispose of the same at pleasure*"—gives the power to assign promissory notes, which are recognized as a part of its property; and it is not pretended that any other part of the charter gives any sanction to the idea that this power was expressly conferred.

The argument in favor of the power rests upon the force of the

words, "*personal estate*," above quoted; and it is said that these words comprehend promissory notes.

Conceding that these words are sufficiently comprehensive in the abstract, to embrace promissory notes; yet the particular inquiry is, not what is the abstract force of the words, or what they *may* comprehend, but in what sense were they intended to be used as they are found in the charter. The sense in which they were intended to be used furnishes the rule of interpretation, and this is to be collected from the context, and a narrower or more extended meaning be given, according as the intention is thus indicated. *Michell* v. *Michell*, 5 Madd. 72; *Hotham* v. *Sutton*, 15 Ves. 320; *Stuart* v. *Earl of Bute*, 3 Ib. 212. And the rule is, that the words " estate" or " effects," and the like, if used in a clause containing an enumeration of personal estate, will generally be confined to *estate* or *effects, ejusdem generis*, with those specified, as being the most natural, when unexplained by the context. *Rawlings* v. *Jennings*, 13 Ves. 46; *Stuart* v. *Bute ; Hotham* v. *Sutton, supra*.

We must look, then, to the connection in which the words are found, in order to ascertain what was in the legislative mind in enacting the provisions of the 2d section, and graduate the general words used accordingly.

The section first prescribes upon what conditions the corporation shall go into operation—fixes its name and the term of its existence—and then follows the provision above quoted, authorizing it " by that name to purchase and possess lands, tenements and hereditaments, and personal estate of any kind whatever," * * * " and to sell and dispose of the same." This is done before any provision is made touching the particular purpose for which the corporation was created, viz., to construct a railroad and to carry on the business of banking, discount promissory notes, deal in exchange, &c. ; and it appears to be wholly independent of the business which was the especial object of the charter, so far as it had respect to promissory notes and evidences of debt. That most material part of the incorporation is afterwards regulated by several sections defining its duties and powers in that respect. By the well-settled rule of construction, therefore, it is plain that these general words in the 2d section have no reference to the espe-

cial business for which the company was chartered. What, then, was the legislative intent in authorizing the acquisition and disposition of "lands, tenements and hereditaments, and *personal estate ?*" It was manifestly to make provision for the purchase and sale of such property, whether real or personal, of *a specific nature,* as might become necessary in constructing the railroad, and in carrying on the business of banking in its usual course—to make provision for something not forming a part of the very business intended to be carried on, and which was, in subsequent parts of the charter, the subject of special attention and regulation. It is evident that the Legislature had not the subject of the purchase or assignment of *choses in action* in view, in this section, from various considerations.

It is a question of at least much doubt, whether the words, "personal estate of any kind whatever," taken alone, would embrace promissory notes; and the contrary opinion would seem to be the result of the authorities in which the question has been involved. *Popham* v. *Lady Aylesbury,* Ambl. 68; *Moore* v. *Moore,* 1 Bro. C. C. 127; *Fleming* v. *Brook,* 1 Sch. and Lef. 318; *Stuart* v. *Earl of Bute, supra;* 2 Wms. Exors. 749, 1st edit. But apart from this, the words as here used cannot be held to embrace promissory notes, for the following reasons:—

1. The context shows that no such thing was in contemplation in the section. The reception and disposition of promissory notes was one of the primary objects of the charter, and they are the subject of special regulation in other and appropriate parts of it. These sections are the proper places for provisions in relation to the use and benefit to be derived to the corporation from the reception and disposition of promissory notes, which were there the subject of consideration, if any such special provisions had been intended to be made. But this section has relation to another and a distinct matter, and promissory notes are not *ejusdem generis* with the subject-matter treated of in it. It is one of the best-settled rules of construction, that words in different parts of a statute must be referred to their appropriate connection; giving to each in its place its proper force, *reddendo singula singulis,* and if possible rendering none of them useless or superfluous. This rule is wholly disregarded in the construction contended for; for if the power to purchase and dispose of *personal estate* means the power

to take and assign promissory notes, it renders the subsequent provisions, in relation to dealing in exchange and in bank and other stocks, useless.

2. The words employed negative the assumption that promissory notes were in contemplation. The language is, " purchase and *possess* lands, tenements and hereditaments, and personal estate of any kind whatever." The word " *possess*" is appropriate to specific property, but not to *choses in action ;* and while all the language used is appropriate to the *purchase, possession,* and *sale* of specific property, none of it has any necessary or clear application to *choses in action.* It is in the last degree improbable that, if the Legislature had intended in this section to grant the power to transfer evidences of debt, language would not have been used clearly and directly applicable to so important a subject in the business of the corporation. It could not have been left to doubtful and inappropriate language.

3. If the construction contended for be correct, the power granted is altogether indefinite. The mode of its exercise is in nowise provided for or indicated ; and the important question arises, how is it to be exercised ? Shall the transfer be by deed or by assignment in writing on the paper, or by a separate instrument, by indorsement, or by mere delivery ? Does the legal title or a mere equitable interest pass to the transferee ? Is the power confined to written evidences of debt, and does it not extend to open accounts, which are as much *personal estate* as promissory notes ? All these important matters are wholly without regulation in the charter ; and if there was no other statute regulating them, it might be asserted as beyond all question, that the charter does not authorize or prescribe an assignment in any particular mode, nor ascertain the nature of the title which should pass by the transfer ; nor could any court, having respect for established principles of law, determine what mode of assignment was intended, or what kind of title passed, or what kind of property should be transferred. It cannot be supposed that if the power of assignment had been intended to be granted, it would have been left to depend upon language so vague as to render its exercise doubtful and impracticable.

4. The provision is wholly unnecessary and superfluous as to promissory notes. The right *to take* such paper, was the very foun-

dation upon which the franchises were granted; which, therefore, required no distinct and express grant of power in order to its exercise. It is merely *recognized* in the subsequent sections. And the right *to transfer* such paper also existed by the general law of the land, which was applicable to all corporations entitled to take promissory notes, as well as to private individuals. *Commercial Bank* v. *Nolan*, 7 How. 508. And this right was universally understood and recognized. Thus, when the right of the corporation to assign notes existed by the general law, it is not to be supposed that the Legislature would perform the idle act of re-enacting that power in this charter; and, if that had been deemed necessary, that it would have been granted in terms so indefinite as to render the right useless.

For these reasons, we think that the conclusion is not to be avoided, that the right to assign promissory notes is not expressly granted in the charter.

II. Is the right, then, *necessary* to the exercise of any of the powers expressly granted, and therefore to be considered as part of the contract?

The doctrine is too well settled in this country, to admit of controversy at this day, that a corporation, created by statute, "possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence." *Dartmouth College* v. *Woodward*, 4 Wheat. 636; and "that it derives all its powers from that Act, and is capable of exerting its faculties only in the manner which that Act authorizes." *Head & Amory* v. *Providence Insurance Company*, 2 Cranch, 127. In order to derive the power to assign promissory notes by implication, it must be shown that it would be *necessary* to the enjoyment of some specially granted right; *so that, without it, that right would fail.* But no such case is presented in this charter.

The special powers of the corporation, in addition to that already considered, appear to be: 1st. A grant of "all the rights, privileges, and powers that may be necessary to enable them to construct, continue, and keep in repair the railroad." Section 4. 2d. A recognition of the right to make loans upon promissory notes. Section 13. 3d. A grant of power to "deal in exchange, and in bank and other public stocks;" and "to issue notes, signed by the

President, and countersigned by the Cashier, &c., which shall be obligatory on the company," &c. Section 15. All these powers could be exercised, and the rights granted be enjoyed, without the assignment of its promissory notes. The right to make contracts for the construction of the road, as well as the right to deal in exchange and public stocks, might be fully exercised without the assignment of its debts; and the use and benefit of its promissory notes, taken for loans, or otherwise, might be fully realized without their assignment. It was no more necessary that the right of assignment should arise from the power to take notes, in the case of this bank, than in the case of a promissory note taken by an individual; for the individual would have as perfect a right of private property in his promissory note, with its incidents, as the corporation could derive from the mere fact of being authorized to take such a note. No right, granted in the charter, fails by reason of the incapacity of the corporation to assign its promissory notes; and, therefore, the right of assignment cannot be claimed as granted by implication in the charter.

We are, therefore, of opinion that no right was secured to the bank by the charter, either expressly or by implication, to assign its promissory notes; and, consequently, that no right or privilege in that respect was violated by the Statute of 1840.

But, it is urged, that that statute has been declared unconstitutional by the Supreme Court of the United States, in the case of the *Planters' Bank* v. *Sharp et al.*, 6 How. 301, and that that decision is conclusive of the judgment in this case. That decision has been yielded to by this court in the cases in which it was made, and might be considered as conclusive of the question of the constitutionality of the statute in question, as it affected the charters of the particular banks there brought under consideration. But it only declares the statute unconstitutional as to those charters, and we cannot admit its obligatory force as applicable to the present case, and will briefly state the reasons why we do not consider it conclusive of this case.

In the first place, it is only the principle declared in that case that can be considered as applicable to the charter presented for our construction in this case; and we do not recognize the right of any other judicial tribunal, either to expound the statutes of this

State, and to determine their legal construction or effect, or to prescribe rules by which we are to be bound in their construction, with the single exception of a statute alleged to be in conflict with the Constitution of the United States. The Supreme Court of the United States is authorized by the 25th section of the Judiciary Act of 1789, to decide the question of the "*validity of the statute of any State, on the ground of its being repugnant to the Constitution of the United States ;*" and, of course, the judgment of that court, pronouncing a State statute unconstitutional, as impairing the obligation of a particular contract, will be conclusive upon the State court, upon the *sole question of the effect and character of the statute presented for consideration.* But we deny the power of that court to expound another statute not alleged to be unconstitutional, and to fix its construction and legal effect in opposition to the adjudications of the State court having jurisdiction of the question, because a particular construction may be attempted to be given to the original statute by the party complaining, and in order to render the second statute unconstitutional.

Whenever a statute is alleged to be unconstitutional, on the ground that it violates rights granted by a previous statute, the first question which arises is, what is the force and effect of the original statute? what are the rights secured by the contract? The solution of that question belongs to the proper judicial tribunals of the State by which the statute was enacted; and no principle of law is of more universal acceptation, or stands upon sounder reason, than that the construction put by the proper courts upon the statutes of their own jurisdiction, is conclusive of their force and effect, and will be so regarded by all foreign judicatures, when they may become the subjects of consideration. Story's Confl. Laws, §§ 272, 277. "This course," says Chief Justice Marshall, "is founded on the principle, supposed to be universally recognized, that the judicial department of every government, when such department exists, is the appropriate organ for construing the legislative acts of that government. Thus, no court in the universe, which professed to be governed by principle, would, we presume, undertake to say that the courts of any other nation had misunderstood their own statutes, and therefore erect itself into a tribunal which should correct such misunderstanding. We receive the construction given by the courts

of the nation as the true sense of the law, and feel ourselves no more at liberty to depart from that construction, than to depart from the words of the statute." *Elmendorf* v. *Taylor*, 10 Wheat. 152. This proceeds upon the reason, that the courts of a country are presumed to have a more intimate knowledge of the reason and object of its statutes, than any foreign tribunal; and, consequently, to be more competent to give a just exposition of them with reference to the purposes for which they were passed.

Accordingly it is said by the Supreme Court of the United States, in the *Commercial Bank* v. *Buckingham*, 5 How. 343, "it is the peculiar province and privilege of the State courts to construe their own statutes ; *and it is no part of the functions of this court to review their decisions or assume jurisdiction over them, on the pretence that their judgments have impaired the obligation of contracts.*" This rule has been often recognized and acted upon by that court, insomuch that they have abandoned their own decisions made in accordance with the rule as settled by the State courts, and conformed to a new and different rule, established by subsequent decisions of those courts.

Is this rule altered by the 25th section of the Judiciary Act, which gives jurisdiction to the Supreme Court, to revise a judgment of a State court declaring that a State statute does not impair the obligation of a contract arising upon a previous statute ? We think not.

The question for the Supreme Court in such a case is, whether the second statute is unconstitutional ; and its power is confined to determining the force and effect of that statute.    That court has authority to declare whether that statute impairs the rights secured by the previous statute or contract.    But how are these rights to be ascertained and determined ?    No question of the constitutionality of the first statute is presented, but the question as to that simply is, what is its force and effect, and what was granted by it ? The right to determine that, stands upon the general principle applicable to the construction of statutes above stated, and must belong to the State court.    If this were not true, any matter of State policy, depending upon its statutes and the expositions of its courts, would be subject to revision by the Supreme Court, whenever any statute subsequently passed might be alleged to affect

rights acquired or claimed under previous statutes or contracts; and, under color of the power to pronounce the statute complained of unconstitutional, that court might proceed to reverse all the decisions of the State courts determining the force and effect of the contract, whether founded on a statute or general rules of law, alleged to be violated by the obnoxious statute, and thus subvert the entire policy of the State upon the subject-matter of the controversy.   And it would follow that the construction of all contracts made under State laws, would be brought within the overruling power of the Federal government, whenever a State might think fit to pass any statute in relation to such contracts.   The fallacy and danger of such a doctrine appear to be obvious.

Suppose that there had been no general statute in this State, authorizing the assignment of promissory notes, and that this bank had transferred a note, claiming the right to do so under the provisions of its charter; and that a question of title in the assignee had arisen, and this court had decided that it had no power by the charter to make the assignment, there can be no doubt but that that decision would have been conclusive of the right of assignment, and that no court could have disregarded it without a violation of established doctrine.   But suppose in addition to this, that afterwards the Legislature, in order to prevent the practice of unauthorized assignments by banks, passed a statute prohibiting such assignments, or repealing the general law authorizing assignments of evidences of debt; and that, notwithstanding this, a suit had been brought by an assignee of such paper, and that the judgment of this court thereupon had been that the assignment passed no title,—could that court, in such a case, reverse the settled law of this State, as held in the case first supposed?   We say decidedly not.   If this was a case of an ordinary contract between two individuals, the force and effect of which had been settled by our courts, it could scarcely be pretended that, upon any question arising upon the validity of a statute subsequently passed affecting that contract, the Supreme Court would be authorized to reverse the construction of the contract settled by this court, and to give it a different force and effect; and the case is equally strong against the power, with regard to the established construction of our own statutes, so that no aid is derived to the argument in favor of the power in the Supreme

Court, from the fact that the charter of the bank is a contract. For whether contract or statute, or both, it is equally subject to the *lex loci contractus*, which this court has the power absolutely to determine. But, if the power of revision exists in the Supreme Court of the United States, it gives to that court authority to reverse the settled law of this State as declared by its constituted tribunal, in relation to the rights vested under its own laws, whenever that court can take jurisdiction by means of another statute which may be passed touching the subject, and the constitutionalty of which may be questioned, when that court would have no power to reverse the decision, as directly made, which settled the construction of the original statute,—thus enabling that court to do indirectly what it has no power to do directly,—to reverse the settled law of this State in relation to our own statutes, by extending the power given by the Judiciary Act to determine the validity of a particular statute alleged to be unconstitutional, so as to authorize that court to give a construction to another statute or contract in opposition to the decisions of our own courts. And the power is thus denied to this court, to determine the rights which pass to a corporation by a charter granted by our own Legislature, and affecting our own people. It may be safely asserted, that no such dangerous and anomalous power was ever intended to be conferred upon that court by the Judiciary Act, which was passed by men who so well understood the rights and powers of the States.

In all cases taken to the Supreme Court, under the Judiciary Act, upon the ground that a State statute impairs the obligation of a contract, the question directly presented for consideration, and which is the ground of the jurisdiction, is, whether *that statute* is constitutional or not. It is true that the question is also involved —what is the right secured by the contract ? But that is not the ground of the jurisdiction, and is merely incidentally involved. The nature and extent of the right under the contract depend upon the law of the State, and must be determined by its own tribunals, which furnish the rule of decision upon that point, in cases of this kind, as in all other cases depending upon the construction of the laws of any State. That is a distinct question from the question whether the right secured is impaired by the statute alleged to impair it, and is to be determined by reference to the settled law

of the State, and not by the views of the Supreme Court upon the subject. And any other dectrine would be in opposition to established principle, subversive of the rightful authority of the State tribunals to interpret their own laws, and to determine the effect of contracts made under them, and productive of conflict between the rules declared by the Supreme Court, and by this court, upon a subject most clearly within our exclusive jurisdiction.

But we do not consider the case relied on as authority in this case, for other reasons.

The terms of this charter are different from that involved in the case cited, in several respects.

1. In that case the language of the grant was, that the bank "shall be capable in law, to have, possess, *receive, retain,* and *enjoy,* &c., lands, &c., *goods, chattels,* and *effects,* of what kind, nature, and quality soever, and the same to grant, demise, alien, or *dispose of,* &c." It was by force of the words "to receive, retain, and enjoy *effects of whatever kind,* and to dispose of the same" that the court held the power to assign promissory notes to be granted. But the language of this charter is much less comprehensive. It is merely to *purchase* and *possess* and to sell and dispose of, *personal estate* of any kind whatever. By the context and the force of this language, promissory notes cannot be embraced, as is above shown.

2. No provision is made in this charter that notes should be taken, *negotiable* in their form—a circumstance in that charter which appears to have had weight with the court in aid of the position that the power to assign promissory notes was intended to be conferred.

3. The promissory note, in this case, was made after the passage of the Statute of 1840, prohibiting assignments of paper by banks; and that, being a general law, not impairing any right specifically granted in the charter, was valid as a partial repeal of the statute authorizing the assignment of promissory notes, and binding upon the bank as to all paper taken subsequent to its passage. *Payne et al.* v. *Baldwin et al.,* 3 S. & M. 661.

These considerations, which appear to have had weight in producing the decision in the case of *Planters' Bank* v. *Sharp et al.,* lead to a different conclusion in the case before us; and, upon con-

sideration of that case, we are satisfied that it is not conclusive of the judgment to be rendered in this case.

It is, however, insisted that the case of *Planters' Bank* v. *Sharp et al.*, has been recognized as binding authority on this court with reference to this charter, and must, therefore, be the rule of decision in this case; and, in support of this view, the case of the *Grand Gulf Bank* v. *The State,* 10 S. & M., is referred to.

It will be seen by reference to that case, that the question of the power of the bank to assign its evidences of debt, was not presented for consideration. That question was not made by the pleadings, nor argued by counsel. The rights of the assignees of the bank were not before the court; nor was it necessary for the decision of the case, as presented, that such a question should have been decided. The question for decision was, whether the judgment of forfeiture against the bank for violation of its charter, was correct, and the court decided that it was. Whether other parties had rights by assignment from the bank, or what effects passed under the judgment of *ouster*, was not presented for consideration; and the judgment cannot conclude such rights. Of course the observations made in relation to the validity of the assignment made by the bank, and the unconstitutionality of the Statute of 1840, cannot be considered as overruling the principles stated in *Payne et al.* v. *Baldwin et al.*, 3 S. & M., especially with reference to a charter materially different in its provisions from that involved in the decision of that case. Nor did the question arise or receive any consideration by the court in the cases of *Grand Gulf Bank* v. *Wood,* 12 S. &. M. 482; *Same* v. *Jeffers,* Ib. 486; *Ingraham* v. *Grigg,* 13 Ib. 29.

It follows from these views of the case, that the decree is erroneous, and must be reversed, and the bill dismissed.