MOBILE AND OHIO RAILROAD Co. *v.* W. F. FRANKS, use, &c.

1. CORPORATIONS: POWERS AND CAPACITIES OF: IMPLIED POWERS.—A corporation possesses only the powers and capacities, which are specifically granted by the act of incorporation, and such as are necessary to carry into effect the powers expressly granted, and such as are so necessary to the enjoyment of some specifically granted right, that without it the right would fail.  2 Kent's Comm. 298 ; 7 How. Miss. 530 ; 35 Miss. 630.

2. RAILROAD COMPANIES: CANNOT LIMIT THEIR COMMON LAW LIABILITY AS COMMON CARRIERS BY SPECIAL CONTRACT.—Railroad companies in this State, by an act of the legislature of the 9th December, 1863, are responsible in all cases of the transportation of freight and baggage as common carriers at common law, notwithstanding any special contract made between themselves and shippers limiting that liability.

3. MOBILE AND OHIO RAILROAD CO.: ACT OF 9TH DECEMBER, 1863, NOT INCONSISTENT WITH ITS CHARTER.—The act of the legislature of 9th December, 1863, which provides that railroad companies shall be liable as common carriers for the transportation of freight and baggage, notwithstanding any private contract that may be entered into between the parties, is not inconsistent with the rights and powers conferred upon the Mobile and Ohio Railroad Co. by its charter.

ERROR to the Circuit Court of Lowndes county. Hon. H. W. Foote, judge.

The suit was for the recovery of the value of three bales of cotton. The declaration is in the common form against a common carrier, for the non-delivery of the cotton at the place of destination. The evidence to sustain the action was a written contract containing the following stipulation: "West Point Station, Nov. 3, 1865. Received from W. F. Franks, three bales of cotton consigned to Marshall & Deas, shipped at owner's risk, as to all damage or injury by fire while in course of transportation." It was agreed between counsel that the cotton was consumed by fire whilst in the due and regular course of transportation, without the fault and negligence of the railroad company, and that the company used their best exertions to extinguish the flames, but failed in their efforts, and were unable to do so. The value of the cotton was proved, and the jury returned a verdict for the full value thereof. A motion for a new trial made and overruled, and a writ of error sued out to this court.

*P. Hamilton,* for plaintiffs in error, contended:

The propositions involved in the charges refused by the court are:

1. That common carriers cannot by special contract limit their common law liability.

2. That the railroad company did not by its charter possess this power of making a special contract.

3. That the bill of lading in this case is not a special contract which limits the liability of the company.

4. That the charter of the railroad company is not a contract executed, so that its obligation could not be impaired by subsequent legislation of the State.

Upon these propositions it is submitted the court plainly erred.

1. The first proposition is negatived by the great mass of authority, English and American. 3 Wallace, U. S. R. 107; 37 Ala. R. 247; 11 Eng. L. & Eq. R. 506; 1 Parsons on Cont. 711.

2. The bill of lading forms the contract. 37 Ala. R. 247.

3. The second and fourth propositions may be considered together and they present whatever of difficulty there may be supposed to exist.

The Mobile and Ohio R. R. Co. was chartered by the legislatures of the States of Alabama, Mississippi, and Tennessee, in 1848. The right is not reserved to the States to alter in any respect the charters so granted.

A private corporation, whether civil or eleemosynary, is a contract between the government and the corporators; and the legislature cannot repeal, impair, or alter the rights and privileges conferred by the charter against the consent and without the default of the corporation, judicially declared and ascertained. 2 Kent, 306; 4 Wheat, 518; 6 Cranch. 88; 7 ib. 164; 9 ib. 43–292; 3 S. & M. 661; 13 ib. 645; 27 Miss. R. 517.

The essence of the contract made by this charter evidently appears to be the right of running its road, and taking reasonable tolls and freight according to its rules for the transportation of passengers and goods thereon. To effect this it has the power to regulate *the time and manner* of such transportation; to fix, regulate, and receive the toll and charges; is vested with all the powers and privileges and immunities necessary to secure these objects, and may make all by-laws, rules and regulations, not contrary to the laws of the State and of the United States,

touching all matters which appertain to the concerns of the company.

By express grant, then, the company is authorized to regulate the manner of transportation, and to make all regulations concerning it, not forbidden by the laws of the land.

The act speaks at the time of its enactment; the company may make all regulations touching the manner of its transportation of freight and passengers, that were not forbidden by the then existing laws of the land.

I. This act, on the part of Mississippi, is a contract not only with private persons, who acted upon the faith of it and invested money in the enterprise; it is no less a contract with the three other States, which concurred in the legislation, and authorized the construction of the road, and the transportation of freight and passengers through their territory.

It is all one as if they had by contract among themselves agreed jointly to a common action by all. It was the only mode in which the States could contract, for they are forbidden by the constitution to make a direct agreement between themselves. It is the common case of one party by his conduct inducing another to act, and so becoming bound in equity to the result produced by his own conduct.

These four States have in effect agreed in consideration of a great common benefit to confer upon this corporation the rights and privileges declared in its charter; and so we have the case of a contract not alone between any one State and the corporation of this company, but between these several States, and between each one respectively and the corporation of the company. It is apprehended, therefore, that no alteration of the terms of the charter can be made by any State singly in any matter that can in the slightest degree affect the company, in the use of its general franchise, and interfere with the management of its business through the length of its line. By virtue of the contract between these States, the general usefulness, and power, and ability of the company to do its work, cannot be impaired in any matter that is common to its business in all the States. By contract among these States, a

right and power of management of its business is given to this company that is the same in all the States. Any change of this right and power in one State alone, would be a violation of the common understanding of all, and could, or at least might, curtail its usefulness in all. If Alabama or Kentucky, in which the termini of the road are located, were to prescribe what goods should or should not be carried on the road, or to prescribe the rate of freight to be received by the company per mile for carriage, or to reduce the rate below the cost of transportation, or to impose onerous taxation so as to cripple the power of the company, or to demand any concession that would interfere with the free management of the business of the company, such legislation would rightfully be a subject of complaint to the other States. So, if those States should impose such conditions upon the company as to compel it to raise its rates of transportation to a point that would otherwise be unnecessary, such legislation would be an injury to the citizens of the other States, through which the road runs ; they would be deprived of the benefits contemplated by the action of their own States when the charter was granted, and so an act of injustice would be committed, contrary to the general understanding raised by the passage of the original act of incorporation by all the States.

Of course, the same result would follow, if the intermediate States imposed conditions that impaired the general usefulness of this great highway of travel and trade. There would be a breach by the State so acting of the contract, tacitly, but on that account not the less plainly, entered into between themselves of all the States, whose concordant action has caused the construction of the road. The spirit and the letter of the constitution of the United States would be thereby violated.

Now we think this is precisely what must occur if the effect contended for it, is given to the act of Dec. 9th, 1863, " compelling railroad companies to be responsible for freight and baggage."

The company finds that it can afford to carry goods at a certain rate. This rate enables it to pay its running expenses,

Mobile & Ohio R. R. Co. v. Franks.

the salaries of its officers, and the interest upon its debts, and incidental expenses. To meet these necessities, it establishes its rates, and declares the terms and conditions upon which the freight will be carried, and offers to all to carry upon these terms. By its charters it is entrusted with the power thus exercised. One of these terms is the clause now sought to be set aside as illegal. If this clause is set aside, a burthen is placed upon the company, that it did not contemplate when it proposed its rates. It is made an insurer of the property. To cover this risk and meet the losses that experience shows will result from this risk, the company must provide a fund. Its only mode of so doing (for that is its only source of income), the company must include the price of the risk in its fare for transportation, and so increase its rate above what the necessities of the case would otherwise require.

This action of the State of Mississippi then directly increases the cost of transportation, which the company would otherwise charge to all the citizens in the four States through which it passes, and who have business with it. A direct injury is produced to these persons, and to that extent the common contract of the four States has been violated. The company is by this means compelled to do an insurance business, which it does not desire to do, which is not a necessary part of the business it is authorized to do, and for which, of course, it must charge an insurance price.

Upon general principles then, and looking only to the effect of this legislation, by Mississippi, upon the citizens of the other States, it is apparent that this act is a violation by the State of its contract with this company and the other States, through which it passes, and falls directly within the principles announced in the Dartmouth College case.

II. The law of Mississippi is objectionable too, because it is a species of partial or class legislation, which is never to be favored. It does not declare any general law, defining the duties of all common carriers; its operation is confined to the one class of railroad companies. A railroad company is not of necessity a common carrier—whether a common carrier or not, depends on the manner of its business.

This law, however, makes all railroad companies common carriers, irrespective of the duties imposed upon them by their charters. To this extent, and in this respect, the law of Mississippi violates the obligation of contracts, by forcing upon them duties that by their charters do not of necessity belong to them, and being of the class above named, confined in its operation to one description of carriers, it is doubly obnoxious to objection.

III. Viewed simply in relation to this one company and its charter from the State of Mississippi, it is believed this law of 9th December, 1863, is unconstitutional and cannot be enforced.

As before stated, this charter of the State to the railroad company is a contract. If it is a contract, it cannot be impaired by any action on the part of the State. 1 Paige R. 102; 2 Kent's Com. 306; and auths. sup.

"The State can pass no act to take away, or impair, any of the franchises or privileges granted by it." *Zabriskie* v. *R. R. Co.*, 6 Am. L. Reg. N. S. 423; or, as it is put, 23 Pick Rep. 340: "The government can rightfully do nothing inconsistent with the fair meaning of the contract which it has made."

It is true the contract may be varied by such act assented to by the corporators; but even then, and under the omnipotence of the British Parliament, the dissenting minority cannot be compelled to agree to a fundamental change of the business of the association. *Natorsh* v. *Swiny*, Gow. on Part. (3d ed.) 576; 4 Johns. Ch. R. 573; 1 Stockton Ch. R. 401; 2 Russ. & Mylne R. 461.

How much stronger the rule with us, under the constitution of the United States as expounded by the United States Supreme Court in the days of its grandeur and glory. 4 Wheat. R. 518; 29 Vermt. R. 549; 5 Hill R. 383.

And in a case where no assent is claimed to have been given by the company, or any of its corporators; and where no right of legislative alteration or amendment is retained in the charter, as in this case.

The question then is, does the act of 1863 in any way

Mobile & Ohio R. R. Co. *v.* Franks.

impair any franchise or privilege of the plaintiff in error, as granted by its charter of 1848?

It is clear by the act (see Ala. Act, § 12), that this company has the right to *fix and regulate the tolls and charges* for its carriage of freight and passengers. No limitation or qualification has been put upon this privilege.

It is contended, therefore, the legislature can do nothing to impair that right, either directly or indirectly. It cannot, therefore, incidentally place upon the company any duty that will take away this right, or compel it to charge higher rates of fare than its sense of justice to the community prescribes.

Yet the act of 1863 compels its assumption of responsibility which it can meet only by an increase of its charges. It is clear that, if the company can barely get along with a given rate of charge, an increase of risk forced upon it against its will can only be borne by it by the demand of higher rates. Its power to fix and regulate its tolls and charges is therefore plainly impaired.

Again, the essence of its charter consists in its right to carry freight and passengers over its road for a reasonable compensation. It is incompetent for the company to engage in any business not within the scope of that object. It could not engage in the business of banking, or in any commercial business.

The act of 1863 requires it to engage in the business of insurance. That is, a charge is compulsorily placed upon it.

It is true, that an incident to the business of a common carrier may be the duty of insurance; but that is not *of the essence* of the franchise or privilege that has been granted to the company; and if it is not part of the regular duty of a railroad company to insure, then to require this company to make such contracts against its will is a violation of its franchise.

That such is not the duty of railroad companies as such, and as the carriers of goods for hire, is plainly shown by all the adjudicated cases to be found in the books, English and American, where railroad companies have been held to the limited liabilities named in their special contracts.

The distinction is plainly put in the Tennessee charter, § 9:

"Said company is hereby expressly prohibited from carrying on any banking operation, but may effect insurance on lives and property transported on said road." There the power to insure is recognized, but it is not declared to be a duty.

So, on general principles, the company might assume the responsibility of an insurer; but that is at its own option, and not at the will of any other party. If done by the will of another party, its option is denied to it, and so the privilege of its charter is impaired.

Again, the company is declared (§ 10) "to have the power to regulate the time and *manner*" in which goods shall be transported; § 7, "to make and prescribe such by-laws, rules and regulations as they may deem needful and proper, touching disposition, &c., of stock," &c. * * * "and all matters whatsoever which may appertain to the concerns of said company," not contrary to the charter, the laws of the State and of the United States. In fact, in common with all corporations, the company has the power of making all reasonable rules for the management of its business. Redfield, Railways, 24.

It is difficult to see what form of words could have been used that would give to this corporation more certainly the power contended for. The object of its creation was the transportation of freight and passengers for hire and reward, on and over a railroad to be built and operated by itself; for this purpose the power of regulation was expressly and fully granted to it, and no limitation is placed upon its power of contracting with the citizens of the States in relation to the object intended to be secured by its creation.

That the power to contract authorizes the entering into such limited liability by special contract, all the authorities upon these special contracts agree. By virtue of this company being a corporation, and offering to carry goods, it is, both upon general principles and the particular grants in *its* charter, authorized to agree with other parties as to *the rates of carriage*, and as to the manner and terms by which those rates are to be determined.

It is not intended to contend, that all power of legislation over this corporation is taken from the legislature of Mississippi.

Its police power, its right of eminent domain, under the restriction of the constitution, and its power of taxation, except as restricted by the charter, remain to the State, as fully as before.

As an instance of the former, the legislature might require cattle-guards to be placed at road-crossings; it might take the property of the company for public use provided compensation be made ; and might pass any tax act it pleased reaching all similar property, after the limitations of section 3d had been reached.

No such general immunity as above is claimed from the control of the State,—all that is claimed in the language of Redfield, C. J., is that what " goes to the constitution of the corporation, and its beneficial operation cannot be revoked," that what " things are essential to the beneficial existence, and successful operations of the corporation, such as individuality, the power to sue and be sued, to have a common seal, and *to contract*," cannot be impaired; and " any act essentially paralyzing the the privilege of running the road, and taking the tolls or fare or freight, or destroying the profits thereon arising, would be void." 27 Vermont R. 144, 5, 6. And we think the effect sought to be given to the act of 1863 brings its provisions within the condemnation pronounced by that judge.

We think that the operation of that act, as set up in this case, goes directly to paralyzing the essential privileges granted by the charter of 1848, inasmuch as it seeks to destroy the power to contract by the company, upon a subject specially confided to it by its charter, and to limit a power that is of the essence of its being, as a corporation for the purposes of its creation ; and to compel it to assume a liability that is not of the essence of its existence, and the assumption of which necessarily imposes the increase of its freight charges, and so adds an additional burthen upon the community. There is no necessity for this compulsory increase of risk and of charge ; because ample indemnity against risk of fire can always be obtained from assurers, who regularly carry on that business at moderate charges.

It cannot be maintained that the legislation here complained of falls within any of the exceptions above admitted to exist. It certainly does not fall within the last two. It is not conceived that in any proper sense it falls within the police power of the State. The statute is not of that class of powers intended to secure the general comfort, health, and prosperity of the people of the State. It is rather an attempt to establish the liabilities of a corporation, and the manner in which it shall exercise a franchise heretofore accorded to this company, and this cannot be legally done. The constitution of the United States forbids all laws which interpolate in the charter any new term or condition foreign to the original agreement. 6 How. U. S. R. 507.

But few attempts since the Dartmouth College case have been made of the kind now before the court. To avoid the effect of that decision, many of the States have by general or special law reserved the right to alter or amend the charters granted by them. Several cases have arisen upon the statutes as to the extent of the power so reserved. But even then the power does not exist to change the purpose of the original corporation, or to authorize individual property to be diverted from the original purpose. 21 Barb. R. 513 ; 47 Me. 189 ; 1 Sumner R. 310 ; 5 Hill R. 383 ; 8 Mass. R. 268 ; 10 ib. 384. Even the express power to revoke the charter of a corporation, under constitutional provisions, can be exercised only for cause. 5 Harring R. 456 ; 23 Pick. R. 345.

It is respectfully insisted on behalf of this company, that this right of contracting with citizens, as to its terms of carriage, *is a part of its contract with the State,* and cannot be impaired by any subsequent legislation without its consent ; that this attempted regulation by the State is not the exercise of a mere police power, and does not fall within that description of legislation which is independent of its contract with the corporation and which the State may exercise over it in common with the citizens of the State. This right to regulate its terms and manner of carriage by the act of incorporation became a part of the *property* of the railroad company, and was of the essence of its

rights. 21 Illinois R. 53 ; 45 Maine R. 507 ; 43 ib. 362. And this is "within the fair meaning of the contract which the State has made."

*Harrison & Crusoe,* on same side, presented following points :

1st. The declaration must correctly state the contract, and if the carrier except his liability from loss occasioned by *fire* it must be stated in the declaration.   Angell on Carriers, §§ 440, 441, 444, 446 ; 1 Greenleaf's Ev. §§ 209, 210.   2 Barn. & Cress. 20.

2d. The principle of the *common law* upon the subject of common carriers is to be understood *with this limitation,* that there is no special contract between the parties which varies the general obligation of carriers; for if there clearly appear such a contract, it governs the case.  Angell on Carriers, § 220, and cases cited ; Story on Bailments, § 549 ; *Whiteside* v. *Thurlkill,* 12 Sm. & Marsh. 600, 601. And we had supposed that it had conclusively settled, at this day, that common carriers may limit their liability against losses by " fire and robbery."

The case will be found collected in Redfield on Railways, pp. 267, 268, and notes. 1 Parsons on Contracts, 703, and notes; 2 Story on Contracts, 760, &c. ; Angell on Carriers, §§ 440, 444, 446 ; *York Co.* v. *Central Railroad Co.,* 3 Wallace U. S. Rep. 107 ; *New Jersey Steam Co.* v. *Merchants' Bank,* 6 Howard (U. S.), 382 ; 13 Barbour, 353 ; 14 ib. 524 ; 1 Kernan, 491 ; 2 Coms. 209 ; 9 Watts, 89 ; 16 Penn. State Rep. 67 ; 10 Ohio, 64 ; 19 Ill. 136 ; 29 Ind. 466 ; 4 Sandf. 136 ; 5 ib. 180 ; 2 Rich. 286 ; 12 B. Monroe, 63 ; 23 Vermont, 186 ; &c., &c., &c. *Gilmore et al.* v. *Carman,* 1 Sm. & Marsh. 304 ; *Neal* v. *Sanders,* 2 Sm. & Marsh. 578 ; *Whitesides* v. *Thurlkill,* 12 ib. 599 ; *Southern Express Co.* v. *Moon,* 39 Mississippi, 833. Still, however, it is to be understood, that common carriers cannot by special agreement exempt themselves from all responsibility, so as to evade altogether the salutary policy of the common law.   *York Company* v. *Central Railroad,* 3 Wallace, U. S. Rep. 107 ; Story on Bailments, § 549.   It is not contended

that a bailee can exonerate himself from the consequences of wilful misconduct or gross neglect.   The Southern Express Company, 39 Miss. Rep., 833.

3d. In relation to the act of the legislature of Mississippi, passed in 1863, during the pressure of the war, we make the following suggestions, in addition to those contained in the brief on file.   Acts, 1863, pp. 146, 147 :

" The railroad companies in this State shall be liable as common carriers for the transportation of all freight and baggage received by them, any obligation that may be entered into between said railroad and other parties to the contrary notwithstanding." This is the entire statute except its title.

In construing acts of the legislature, an intention to change any pre-existing law should appear very clearly, to warrant any presumption to that effect.   Lee v. Forman, 3 Metc. (Ky). 114.

Where a statute is capable of two constructions, the one consistent with the constitution will be adopted.   Duncombe v. Pringle, 12 Iowa (4 With.), 1.

1. The statute does not profess to change or alter the law, in any respect, in relation to common carriers.   The general law upon the subject of carriers remains as before the passage of the statute.   The act is aimed only at the railroads in this State, and at them only so far as to compel them to be responsible, just like the other commoncarriers in the State, "for the transportation of all freight and baggage received by them, any " obligations" that may be entered into between said railroads and other parties to the contrary notwithstanding."

The act professed to have a single and special object, and that was to declare that the railroads should not repeal the general law of the land then subsisting as to all common carriers, and except themselves from the operations of the law altogether by certain " obligations" with other parties, but that, notwithstanding such obligations to the contrary, they should be liable just as other common carriers who were not concerned in entering into such obligations were.

The act does not undertake to change the law upon the subject of common carriers either by land or water, but only

*restricts* the railroads within the common bounds, and compels them to stand on the legitimate platform occupied by all common carriers alike and in common.

It was merely a restraining act to keep railroads within lawful limits.

Steamboats, and all other carriers, both by land water, can *limit* their liability as common carriers against losses *by fire*, and that by the principles of the common law. The common law is to be understood with this limitation. Angell on Carriers, § 220 and cases cited; Story on Bailments, § 549; 12 Sm. & Marsh. 600, 601. And the statute in question only declares that the railroads shall be liable as common carriers are liable, and that is all.

2. In construing the act we must look to the old law, the mischief, and the remedy. The law as it existed at the time the act was passed, allowed the limitation as to exceptions against losses *by fire*. The mischief intended to be remedied was to get rid of certain "obligations" entered into at that time between the railroads in this State, and other parties.

The remedy was to cut off the offensive obligations, and to compel railroads to restrain themselves within the lawful bounds of common carriers.

The statute says nothing about the common law. It merely declares that the railroad companies referred to "shall be liable as common carriers for the transportation of all freight and baggage received by them." Just as other common carriers.

3. It will be remarked also, that the provisions of the statute are confined to "freight and baggage."

4. And it extends to "all" freight and baggage *received by them*. The act was passed during the war.

5. The military had control during the war. And so the statute said that the railroads *in this State* should be liable, as common carriers, "*for the transportation of all freight received by them.*"

Some things the railroads refused to transport altogether, or refused to be responsible for them. They prohibited their agents from receiving "gold and silver coin, plate, bullion, jew-

elry, pictures, bank bills, and other valuable papers and writings." Other articles of a perishable nature, such as "glass, eggs, liquids, musical instruments," &c., the company refused to be responsible for, except in case of gross neglect; and so the legislature interposed to a certain extent, and declared, "That the railroad company in this State shall be liable, as common carriers, for the transportation of *all* freight and baggage *received by them*, any obligation that may be entered into to the contrary notwithstanding." The object of the statute seems to be plain, and the extent that it is intended to go appears clearly enough.

The railroads, by certain obligations that they have resorted to, had overstepped what the law allowed, and had refused to be responsible, as common carriers, and had attempted to evade the salutary policy of the law. They attempted to exempt themselves from all responsibility. Hence the statute. The very title of the act is, "An act *compelling* railroad companies to be responsible for freight and baggage."

If this construction of the statute is correct, as it seems to us to be, then there is no necessity for arguing the constitutional, and other questions.

*Clayton, Christian & Sykes,* for defendant in error, contended:

1. That the question of the right of a common carrier to limit his common law liability by especial contract is an open question in this State, as far as the decisions of the Supreme Court are concerned.

This court, in *Southern Express Co.* v. *Moon,* 39 Miss. R. 382, expressly waived a decision of the question, and state that "we concede the number of cases sanctioning this doctrine greatly preponderate in favor of the right of limitation by special contract." We may infer that whilst the number of cases greatly preponderate, the weight of authority is on the other side.

To hold that the railroad companies have the right to limit their common law liability, places the people at the mercy of

the corporation—their requirements, however tyrannical and unjust, must be complied with; it is "Hopson's choice," that or nothing.

This question has been settled by the legislature of the State in an act which provides that railroad companies shall be liable, as common carriers, notwithstanding any private contract. See acts of 1863.

2. That the act of December 9, 1863, was not in violation of the charter of the Mobile and Ohio Railroad Company. 2 Kent's Com. 298; 9 How. U. S. 172; 27 Penn. 339; 21 Conn. 294; Pierce's Am. R. R. L. 1–9–12; 4 Peters' R. 514–516; 10 How. 376; 13 S. & M. 645.

3. But under the facts of this case, upon the assumption that railroad companies have a right to limit their liability, under the decisions they cannot limit against their own carelessness. The cotton was in transitu, and the fire must have originated from the train, or from sparks from the engine. This could have been prevented by the exercise of proper care and diligence.

HARRIS, J., delivered the opinion of the court.

This action was brought against the plaintiffs in error to recover the value of cotton shipped at West Point, in this State, to be delivered in Mobile. The declaration is in the common form against a common carrier, on their general liability as such. The bill of lading specified that the cotton was shipped at the owners' risk as to all damage or injury by fire while in course of transportation, and was signed by the plaintiff, as well as by the agent of the defendants. It was admitted that the cotton was destroyed by fire, casually, and without the consent or negligence of the defendants, whilst in the regular course of transportation on the railroad, between the points of shipment and destination.

On the foregoing case the court refused the following instructions asked by the defendants:

1. That common carriers, by express stipulation in their contracts or bills of lading, may limit the extent of their lia-

bility at common law, and provide against responsibility for losses occasioned by fire, and the like.

2. That by the terms of their charter the defendants have and possess such right, in common with other common carriers of this State.

That the bill of lading in this case is a special contract between the parties, and the carrier is not liable thereon as a common carrier, but only as a special carrier; and the duties and liabilities of the defendants are governed by the terms of the special contract, and the action should be upon the special contract, or for a breach of duty arising therefrom.

4. That the charter or grant is a contract executed, and a succeeding legislature could not impair the obligation of the contract, or divest rights vested under it.

The case involves the construction and effect of the act of the legislature of this State, approved 9th December, 1863, pamph. 146, which enacts that "The railroad companies in this State shall be liable, as common carriers, for the transportation of all freight and baggage received by them, any obligation that may be entered into between said railroad and other parties to the contrary notwithstanding."

This act is untechnically and unartificially drawn, but its intention is quite apparent to prohibit railroad companies in this State from making any contract with shippers, to limit their liability, as common carriers, for freight and baggage received by them for transportation, and to hold them responsible in all such cases as common carriers, notwithstanding such special contracts.

The point submitted for our decision upon this state of facts, by the written agreement of counsel appearing in the record, is, "whether the plaintiffs in error have the right to *limit* their liability by special contract, and provide against responsibility for losses occasioned by *fire*, provided such special contracts do not attempt to cover losses occasioned by negligence or misconduct." In other words, whether the act of Mississippi of December, 1863, is obligatory upon the railroad companies of this State, holding them to the common law liability of common carriers.

It is insisted on behalf of plaintiff in error that its charter is a contract, without any clause of reservation to the State authorizing a change of its terms. That by *express grant* the company is authorized to regulate the manner of transportation, and to make all regulations concerning it, not forbidden by law. And that the effect of the act of December, 1863, of this State, is to compel the company to increase its charges for freight and transportation, and to compel it to do an insurance business, and hence the act is in violation of the charter contract, and unconstitutional. It is further insisted that the act makes this company a common carrier, and in this respect violates the contract by requiring the company to assume the duties and obligations of common carriers, at common law.

In this country there is no diversity of opinion as to the rules to be applied in determining the powers and capacities of a corporation. A corporation is an artificial being created by law, for specified purposes. It stands, therefore, on a very different footing from a natural person. There is this distinction between an individual and a corporation: "An individual may perform all acts, and make all contracts, which are not in the eye of the law inconsistent with the welfare of society. A corporation possesses only the powers and capacities which are specifically granted by the act of incorporation, and such as are necessary to carry into effect the powers *expressly* granted, and hence it can make only such contracts as are *connected with the purpose for which* it was created, and which are necessary either directly or incidentally to answer that end. 2 Kent, p. 298; 7 How., Miss. R., p. 530; *Abby* v. *Billups*, 35 Miss. R., p. 630. In the case of *McIntyre et al.* v. *Ingraham et al.*, 35 Miss. R., p. 25, it was held by this court that a corporation created by statute possesses only the powers which its charter confers upon it either *expressly* or as incidental to its very existence, citing Dartmouth College case, 4 Wheat. 636; 2 Cranch, 127. It was futher held, that in order to derive a power by implication, it must appear that the power thus sought to be implied is so necessary to the enjoyment of some specially granted right, that without it that right would fail.

We are then to look to the charter of this company to ascertain, first, whether there is an *express* delegation of power to this company, to limit its common law liability as a common carrier, existing at the date of its charter, by making special contracts on this subject with its customers; and second, if not, is such a power so *necessary* to the enjoyment of any other, specially granted, right, that without it such right would fail?

It is not pretended by counsel for plaintiff in error, that there is any such *express* delegation of power to this company.

Is there any other power or right granted in this charter, which would fail, without a power was exercised by this corporation, to limit its common law liability as a common carrier, by contracts with its customers?

It will be remembered that the *purpose* of the act, approved the 17th February, 1848, is declared in the 1st section to be to locate, construct, and finally complete a single double or treble railroad, or way, from some suitable point in the city of Mobile, in a westerly or north-westerly direction, to the west line of this State (meaning the State of Alabama), towards the mouth of the Ohio river, in such route as shall be deemed most expedient; and to transport, take, and carry property and persons, upon said railroad or way, by the power and force of steam, of animals, or of any other mechanical or other power, or any combination of them, which said company may choose to apply.

This being the purpose of the organization of the company as declared by its charter—the building a railroad to transport property and persons—it cannot be urged with any fairness, that it was not designed by its charter to create it a common carrier, as soon as the road could be built—both of property and persons, for hire or reward. Unless, therefore, this charter by its terms exempted the company from the obligations of the existing law of common carriers, in force in Mississippi at the date of its passage, and ever since; or, by an enabling clause, empowered the company to exempt itself by special contracts with its customers, or to limit the extent of its liability—nothing can be more manifest than that it possessed no such power, and was never exempt at all from its common law obli-

gations in this respect, even prior to the act of December, 1863, of Mississippi, and that the State's power to legislate in relation to the preservation of this cherished policy of the law, remained unimpaired, by this charter. There being no such *express* provision in the charter, we are to examine its provisions to see whether there is any *other* granted power or right, which would fail; without this corporation can limit by special contract with its customers, its common law obligations.

By the seventh section of its charter " the directors shall have full power and authority to make and prescribe such by-laws, rules, and regulations as they shall deem needful and proper, touching the disposition and management of the stock property, estate, and effects of said company, not contrary to this charter, or the laws of this State or of the United States, the transfer of shares, the duties and conduct of their officers and servants, touching the election of and meeting of the directors, and all matters whatsoever which may appertain to the concerns of said company," etc.

By the tenth section the " said company is authorized to construct, erect, build, and use a single, double, or treble railway or road, of suitable width," etc.; " and also * * * to build and construct branch railroads on either side of the main road, not exceeding thirty miles, and shall have power to regulate the *time and manner* in which goods and passengers shall be transported, taken, and carried on the same; and shall have power to erect and maintain toll-houses and other buildings for the accommodation of their concerns, as they may deem suitable for their interest."

Section twelve provides: " That it shall be lawful for the company hereby incorporated from time to time, to fix, regulate, and receive the toll and charges by them to be received for transportation of persons or property on their railroad or way aforesaid, hereby authorized to be constructed, erected, built, or used, or upon any part thereof."

These are the only clauses in the charter to which any reference is made by counsel on either side as bearing on this question.

It is not insisted that in either of these clauses, or indeed in any part of the charter, is there any grant, dependent for its operative force on the existence of a power in this corporation, to limit by special contract its common-law liability as a common carrier. But it is said that its power to fix and regulate the tolls and charges for the transportation of property and persons will be thereby so affected that they will be compelled to *increase* said tolls and charges to enable them to meet the expenses incident to such liability, and that *this is a violation of their contract with the State.*

We have seen that the sole purpose of their charter was to enable them to build the road, that they might become common carriers, or *transport property and persons* along their line.

The argument then is—that if they cannot avoid their *charter obligations*, as common carriers, their profits will be thereby diminished, and they will be compelled not only to increase their charges to meet such expense, but to assume the office of common carriers, and to become insurers, as such, and that *this* is a violation of a charter the sole purpose of which was to create them common carriers, and thereby subject them to this very responsibility. The statement of the argument is its best refutation.

There is, then, no *granted* power or right in this charter which *must fail*, unless the corporation can exercise the power claimed, to limit by special contract with its customers, its common law liability as a common carrier. Hence no such power can be derived by implication. It is not the form of the contract, but the *policy of the law* which determines the extent of the carrier's liability. When he is charged as a carrier, it is on ground of an obligation imposed upon him by law. Edwards on Bailment, pp. 446-7.

The unbroken uniformity with which the courts have upheld and sustained the necessity, utility, and safety of this *policy of the law*, has been the subject of just commendation by some of the ablest jurists and · elementary writers. In the case of the *Southern Express Company* v. *Moon*, 39 Miss. R. p. 822, we have said, rigorous as this law may seem, and hard as it may

actually be in some instances, it is, nevertheless, founded on principles of public utility and safety, to which all private considerations ought to yield.   *   *   *   The *public policy*, on which the extraordinary liability of common carriers is founded, is too important to be thus virtually repealed by the fraud and circumvention of artfully contrived, printed or prepared, receipts thrust upon those to whom the hurry and press of railroad travel deny the time of examination, or the opportunity of fair assent; and we then expressly waive the determination of the question, how far this great *public policy*, the growth and maturity of ages, founded on public necessity and safety as well as public utility and convenience, can be repealed by special contract between the parties, and all the hazard and all the evils, intended by this policy to be prevented and avoided, again introduced.

We still reserve for future consideration this general question, when it shall directly arise.   The case before us does not necessarily call for its consideration.

The impossibility of placing the parties upon equal terms—in these cases of contracts for the limitation of the responsibility of great corporations, as common carriers—presents an almost insurmountable obstacle to anything like *fair assent*.   *Assent* to the terms demanded by the corporation agent, or a denial by him of all the benefits of its facilities for transportation, for the most part leave the traveller or shipper no alternative but submission to their dictation, however unjust or illegal.   Hence the wisdom of the act in question, if such act was necessary to accomplish the object in relation to the railroads of this State. There is nothing in the act inconsistent with the rights and powers confined upon this corporation by its charter.   Its purpose was to protect and preserve the great principles of the law of carriers, as a matter of public policy, safety, and convenience. The power of the legislature, thus to guard the public safety, is undoubted.

The charges asked by plaintiff in error were all correctly refused.

Let the judgement be affirmed.